**GREAT BEND BRICK & TILE COM-
PANY, Inc., Plaintiff,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. No. W-1914.**

United States District Court
D. Kansas.

April 7, 1961.

———◆———

Joe F. Balch, Balch & Briley, Cha-
nute, Kan., Joseph B. Brennan, Suther-
land, Asbill & Brennan, Atlanta, Ga.,
Willis B. Snell, Sutherland, Asbill &
Brennan, Washington, D. C., for plain-
tiff.

George E. Peabody, Asst. U. S. Atty.,
Wichita, Kan., and Harvey Schneider,
Department of Justice, Washington, D.
C., for defendant.

HILL, Chief Judge.

This is a tax refund case, in which
plaintiff seeks to recover the amount of
$45,202.13, paid as income taxes for the
years 1952 through 1955.[1]

The question presented is whether
plaintiff's "gross income from the prop-
erty" for purposes of computing its per-
centage depletion deduction for its clay
is the selling price of its burnt brick and
tile (as contended by plaintiff) or wheth-
er it must constructively compute its
depletion allowance (in accordance with
the applicable Treasury Regulations) by
applying the percentage rates to that
portion of its gross income which is at-
tributable to the basic marketable prod-
ucts of the fire clay and brick and tile
mining industries, i. e., raw (crude) fire
clay and raw (crude) brick and tile clay.

All of the relevant facts have been
admitted by the answer or stipulated.
The parties are submitting the case on
the pleadings and the three stipulations
on file with the Court. Therefore, it is
only necessary to state that the stipula-
tions show in general that during the
years 1952 to 1955, plaintiff was engaged
in the business of mining clay from pits
which it owned and making brick and
tile from such clay in a plant located near
such pits. Thus the taxpayer is a so-
called integrated miner-manufacturer.
During these years, 77 per cent of the
clay mined and used by plaintiff was "re-
fractory and fire clay" and the other 23
per cent was "brick and tile clay". Like
the plaintiff, all Kansas producers are in-
tegrated miner-manufacturers. There
is, therefore, an opportunity to sell only

---

1. The suit originally involved a dispute
   as to the proportionate amount of tax-
   payer's clay which qualified as brick and
   title clay within the meaning of § 613(b)
   (5) of the I.R.C.1954, 26 U.S.C.A. § 613
   (b) (5), subject to a 5% depletion allow-
   ance, and as refractory and fire clay
   within the meaning of § 613, subject to
   a 15% depletion allowance. This matter
   has been resolved, and the question now
   concerns the amount against which these
   percentages are to be applied.

a negligible amount of either type of clay in Kansas. The stipulation does reflect the sale of raw clay in substantial quantities in other parts of the United States by producers. The plaintiff here used virtually all of the clay it mined in its own plant.

A taxpayer is entitled to a deduction for depletion of its capital assets. The depletion deduction is authorized by the Internal Revenue Code of 1939, and 1954, and computation of the percentage depletion method is the same under both 1939 and 1954 code provisions.

The percentage granted by the statute is on taxpayer's "gross income from mining". We are not concerned with rates; it has been stipulated that both types of clay are depletable—fire clay at 15 per cent and brick and tile clay at 5 per cent. If mining includes all processes applied in manufacturing its finished product, gross income from mining is the sales price of those finished products. If, on the other hand, "mining" is limited to the treatment processes which non-integrated miners normally apply to the same minerals, the taxpayer's gross income is limited to that portion of its gross income which is attributable to the product and any normal processes applied by ordinary miners. The statutes provide methods for such computation but they need not be made because it is agreed if the Government's position is upheld gross income would not be greater than that already allowed and plaintiff would be entitled to no recovery.

As now enacted Section 613 of the 1954 Code, which is the same as Section 114(b) (4) (B) of the 1939 Code, 26 U.S.C.A. § 114(b) (4) (B), defines mining as including not merely the extraction of the ores or minerals but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.

Essentially, the inquiry here is whether or not a cutoff point to mining is prescribed for integrated miner-manufacturers, and where that point lies.

The Government relies upon the recent case of United States v. Cannelton Sewer Pipe Company, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581, in fact, places its sole reliance upon that decision and asserts the taxpayer's case depends upon whether they can avoid the effect of it. Prior to Cannelton the question presented here seemed well settled by a long line of decisions on the trial level and in various circuits.[2] The suit was brought by Cannelton for an income tax refund based on the statutory percentage depletion allowance.

The Cannelton case discloses the following facts. During the year in suit the taxpayer extracted large quantities of fire clay and shale from its mine located at Cannelton, Indiana. 80 tons of such fire clay was sold for $22.88 per ton but the greater portion of the mined clay was used to manufacture sewer pipe, a finished product. At the same time, in the State of Indiana and immediately across the Ohio River in Kentucky there were substantial sales of raw fire clay without processing. Subsequently Cannelton began securing its fire clay from these sources. In that locality there was a ready market for fire clay and shale as they came from the ground without processing, but, because of Cannelton's cost of production, it could not sell its raw clay at a profit.

The taxpayer contended that its first "commercially marketable miner product" was sewer pipe and vitrified articles. The plaintiff prevailed in the district court on this theory. The Court of Appeals affirmed, holding that plaintiff could not profitably sell its raw clay and shale without processing it into finished products, and that its statutory percentage depletion allowance was therefore

2. United States v. Cherokee Brick & Tile Co., 5 Cir., 218 F.2d 424; Townsend v. Hitchcock Corp., 4 Cir., 232 F.2d 444; United States v. Sapulpa Brick & Tile Corp., 10 Cir., 239 F.2d 694; United States v. Merry Brothers Brick & Tile Co., 5 Cir., 242 F.2d 708, and many more.

properly based on its gross sales of the latter.[3] The Government contended, as here, that the product from which "gross income from mining" is computed is an industry-wide test and cannot be reduced to a particular operation that a taxpayer might find profitable. The Government also argued that while the statute permits ordinary treatment processes normally applied by miners to the raw product of their mines to produce a commercially marketable mineral product, it does not embrace the fabrication of the mineral product into finished articles.

The Court, after setting out the above factual situation, carefully detailed the legislative history of depletion allowance, and from that history, made this conclusion on page 86 of the opinion in 364 U.S., on page 1586 of 80 S.Ct.:

"From this legislative history, we conclude that Congress intended to grant miners a depletion allowance based on the constructive income from the raw mineral product, if marketable in that form, and not on the value of the finished articles."

On the same page of that opinion, and on page 1587 of 80 S.Ct., the Court further stated:

"Depletion, as we have said, is an allowance for the exhaustion of capital assets. It is not a subsidy to manufacturers or the high cost mine operator * * * The question in depletion is what allowance is necessary to permit tax-free recovery of the capital value of the minerals."

On page 87 of 364 U.S., on page 1587 of 80 S.Ct. the Court further says:

"Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, i. e., where the ordinary miner shipped the product of his mine * * * As we see it, the miner-manufacturer is but selling to himself the crude mineral that he mines, insofar as the depletion allowance is concerned."

On the Court's interpretation of "ordinary treatment processes", on the same page of the opinion, and on page 1587 of 80 S.Ct., it quotes from the testimony of the principal industry witness at a Congressional hearing:

"Obviously it was not the intent of Congress that those processes which would take your products and make them into different products having very different uses should be considered, as the basis for depletion."

The Court then comments on the taxpayer's position in that case in regard to "ordinary treatment processes" as follows:

"But respondent says that the processes it uses are the ordinary ones applied in the industry. As to the miner-manufacturer, that is true. But they are not the 'ordinary' normal ones applied by the non-integrated miner. It was he whom the Congress made the object of the allowance. The fabrication processes used by respondent in manufacturing sewer pipe would not be employed by the run-of-the-mill miner—only an integrated miner-manufacturer would have occasion to use them."

On the taxpayer's contention in that case that it must utilize the fabrication processes used by it in order to obtain a "commercially marketable mineral product or products", the Court says:

"This position leads to the conclusion that respondent's mineral product had no value to it in the ground. If this be true, then there could be no depletion. One cannot deplete nothing * * * Depletion, as we read the legislative history, was designed not to recompense for costs of recovery but for exhaustion of mineral assets alone. If it were extended as respondent asks, the miner-manufacturer would enjoy, in addition to a depletion allowance on his minerals, a similar allowance on

3. Cannelton Sewer Pipe Company v. United States, 7 Cir., 1959, 268 F.2d 334.

his manufacturing costs, including depreciation on his manufacturing plant, machinery and facilities."

Counsel for plaintiff, in their brief and oral arguments, have attempted to limit the holding and effect of the Cannelton case to the particular facts of that case, and contend that it has left our own Tenth Circuit Court case, the Sapulpa case, supra, and the other cases in that prior series of cases intact. I am mindful of those cases and agree that Cannelton did not expressly overrule them. But it must be remembered that in all of those cases, the Government had conceded or assumed that clay was not commercially marketable. This is what, I believe, the Court had in mind, when at page 89 of the opinion in 364 U.S., on page 1588 of 80 S.Ct., stated:

> "Nor do we believe that the District Court and Court of Appeals cases involving percentage depletion and cited by respondents are apposite here. We do not, however, indicate any approval of their holdings. It is sufficient to say that on their facts they are all distinguishable."

Footnote 10 on the same page states:

> "Respondent's cases are based on United States v. Cherokee Brick & Tile Co., [5 Cir.], 218 F.2d 424, (adhered to in United States v. Merry Bros. Brick & Tile Co., [5 Cir.], 242 F.2d 708) which went off on factual concessions not present here * * For our purposes, we need not reach the question of whether in those cases the minerals in place had any 'value' to be depleted. * * * "

As in Cannelton, the Government has made no concessions here that the clay is not commercially marketable. In fact, it strongly argues that under the stipulated facts and the Cannelton case, plaintiff's raw clay, of both kinds, is commercially marketable. I am in agreement with the Government's position.

There appears no need to lengthen this memorandum with a further discussion of Cannelton, except to say, in my opinion that case does not have the narrow meaning and effect, subscribed to it by plaintiff's counsel. To the contrary, it appears to me to be a complete answer to every question posed in the case at bar. The interpretation of that case by the Government is correct.

In conclusion the taxpayer's gross income from mining, its depletion base, must be computed on the basis of the raw clay, both as to fire clay and as to brick and tile clay.

Therefore, judgment in the case be and it hereby is, entered in favor of the defendant, the cause is dismissed with prejudice and plaintiff will pay the costs.