COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

Albin C. HALQUIST and Madeline E. Halquist, Respondents.

No. 13107.

United States Court of Appeals Seventh Circuit.

May 5, 1961.

Rehearing Denied En Banc, June 5, 1961.

Lee A. Jackson, Chief, Appellate Section, James P. Turner and Melva M. Graney, Attys., U. S. Department of Justice, Washington, D. C., Louis F. Ober-dorfer, Asst. Atty. Gen., Abbott M. Sellers, Acting Asst. Atty. Gen., Charles K. Rice, Meyer Rothwacks, Department of Justice, Washington, D. C., for petitioner.

Richard D. Hobbet, Frank J. Pelisek, Milwaukee, Wis., for respondents. Michael, Spohn, Best & Friedrich, Milwaukee, Wis., of counsel.

Before HASTINGS, Chief Judge, and KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

The facts in this case are largely stipulated or undisputed. During the taxable years 1951 through 1954, respondents Albin C. Halquist and Madeline E. Halquist, his wife, as a partnership, Halquist Lannon Stone Company (hereinafter called "Halquist") engaged in the business of removing stone from two quarries in Waukesha County, Wisconsin.

This stone was sold in the form of two products: crushed stone and "dimension" stone [1] of various shapes and sizes. Halquist also bought, processed and sold some dimension stone from other quarries. There was evidence that these stones usually were of a type not available in Halquist's own quarries.

In the Halquist quarries, the uppermost strata consist of thinly bedded slabs broken by seams or joints which result in blocks of varying size from a few square feet up to 25 or 50 square feet, and from about two to six inches in thickness. Dimension stone for building is taken from these upper strata. The uppermost level produces a thinner layer of stone suitable for flagstones and drywall.[2]

The lower strata are markedly different stone from these upper levels and are suitable only for crushed and broken stone.

---

[1]. "Dimension" stone includes blocks and slabs of natural stone used for building, monuments, paving, curbing and flagging.

[2]. Flagstones are irregularly shaped, about two inches thick, with at least one flat side, and are used for landscaping. Drywall, about eight to ten inches in width, and two to four inches in height, is usually used for retaining walls.

Halquist removes the stone from the upper strata in its natural shapes and sizes. The stone thus removed is sorted into three classes: (1) waste; (2) flagstone and drywall, requiring mere breaking and splitting; and (3) stone suitable for process as dimension stone.

The waste is dumped into the pit of the quarry from which it is picked up and fed to the crusher.

The stones of the third class are carried to cutters, about 50 to 250 feet away from the place where the stone is quarried. The cutters then cut and break the stone into regular shapes of random lengths and heights suitable for use as veneer stone, a form of dimension stone in which the width is about the thickness of the wall to be built usually about four inches, the length is the horizontal measurement of the stone in the wall, and the height is its vertical measurement in the wall. In the processes of cutting, for which various tools and methods have been used, 40 to 50% of the weight is lost and becomes waste which is sold as crushed stone.

Halquist contends that veneer stone is its principal product; that production and sale of crushed stone and of agricultural limestone is a secondary operation, in part dictated by proper quarry housekeeping to dispose of the waste along with the stone of the lower levels which is suitable only for crushed stone.

The applicable statutes [3] provide for percentage depletion allowance of the gross income from mining. "Mining" is limited to the ordinary treatment processes normally applied by mine owners and operators to obtain the commercially marketable mineral product or products. In computing its depletion allowance, Halquist used the gross proceeds (less delivery costs and discounts) from the sale of its crushed and broken stone, its flagstone and drywall, and its fully processed veneer dimension stone.

The Commissioner took the position that the gross income from mining was limited in the case of these quarries to the value of the rough uncut stone, or alternatively, (1) that the gross income be computed as though all the stone had been sold as crushed stone, or (2) that flagstone and drywall be considered the first commercially marketable products obtained from the upper levels.

The Tax Court redetermined all deficiencies as requested by Halquist, and the Commissioner appealed to this Court.

The Tax Court considered this case after our decision in Cannelton Sewer Pipe Co. v. United States, 7 Cir., 1959, 268 F.2d 334, but before the U. S. Supreme Court had reversed that decision in United States v. Cannelton Sewer Pipe Co., 1960, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581.

Accordingly the Tax Court gave considerable weight to the theory that a taxpayer must be in a position to sell his product at a profit before it can be "commercially marketable." That theory has now been rejected by the U. S. Supreme Court in Cannelton. Standard Realization Co. v. United States, 7 Cir., 289 F.2d 247.

There is no dispute with reference to receipts from the crushed stone or the flagstone and drywall phases of the operation. These are to be included in the depletion base without reduction. The sole question before us concerns the processing of the dolomite dimension stone (taken from the upper faces of the quarries) into the veneer building stone, which Halquist considers to be its principal product.

On the undisputed facts, it appears clear that Halquist's basic mineral product from these upper faces is the uncut block of dimension stone prior to its delivery to the cutters who process it into veneer stone. Halquist asserts that, unlike the products involved in Cannelton and in Great Bend Brick & Tile Co. v. U. S., D.C.Kan., 194 F.Supp. 309 on which the Commissioner relies, Halquist's rough uncut blocks cannot be sold

3. Internal Revenue Code, 1939 § 114(b) (4), 26 U.S.C.A. § 114(b) (4)—10%

Internal Revenue Code, 1954, § 613, 26 U.S.C.A. § 613—15%

in substantial quantities because such sale would entail impractical transportation of material which will ultimately prove to be about 50% waste.

However, in the light of Cannelton, we may not include processing the rough, uncut blocks into veneer stone under the heading of "mining" processes. Lacking local or area sales of the precise stone in Halquist's quarries to establish the cutoff point when the mineral first becomes suitable for industrial use or consumption, we must have recourse to the recognized branch of the mining industry to which Halquist may be assigned.

The evidence supports a conclusion that Halquist's operations deal, in effect, with two types of quarries: one yielding dimension stone, and the other yielding crushed stone. The evidence further shows that in typical dimension stone mining, rough blocks are removed and sold for process in substantial quantities. Cannelton prescribes an objective, standard cutoff point to be uniformly applied throughout each particular branch of the mining industry.

Because of certain physical properties in most of Halquist's stone, the high percentage of waste makes it uneconomical for cut-stone processors to purchase it in its rough uncut state and transport it for any extensive distance. In effect Halquist, therefore, sells its rough uncut stone to itself for cutting and completion processing within a very short distance from the place where it is quarried. The evidence shows that where large enough dolomite blocks were available from the same formation as that worked by Halquist, those blocks were sold in the rough uncut state to processors who engaged in cutting operations.

In Cannelton, the taxpayer sold none of its product in its raw state because, due to its high cost of operation, it could not compete at a profit with other producers. The whole theory of the depletion allowance is to compensate for depletion of the mineral deposit.

The Tax Court's judgment must, therefore, be reversed. The cause is remanded with directions to compute Halquist's percentage depletion base on its *receipts* from the sale of crushed stone (as adjusted to avoid duplication of receipts from sale of the waste from cutting veneer stone, which waste is sold as crushed stone); receipts from sale of flagstone and drywall; and an allocation of the receipts from the sale of building stone attributable to the rough, uncut blocks as removed from the quarry, prior to delivery to cutters for processing.

Reversed and remanded.