Robert A. RIDDELL, District Director of Internal Revenue, former Collector of Internal Revenue, Appellant,

v.

VICTORVILLE LIME ROCK CO., a corporation, Appellee.

No. 16714.

United States Court of Appeals Ninth Circuit.

June 23, 1961.

Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, James P. Turner, Attys., Dept. of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Edward R. McHale, Eugene N. Sherman, Asst. U. S. Attys., Los Angeles, Cal., for appellant.

Watkins, Lund & Peck, Richard F. Alden, Robert J. Blaylock, Los Angeles, Cal., Harold E. Smith, Atlanta, Ga., for appellee.

Before STEPHENS, BARNES and JERTBERG, Circuit Judges.

JERTBERG, Circuit Judge.

Before us is an appeal by the appellant from a judgment of the district court awarding a refund of a portion of the income and excess profits taxes assessed against and paid by appellee for the calendar years 1950 through 1953.

Jurisdiction was conferred on the district court by Title 28 U.S.C.A. § 1346. This Court has jurisdiction of the appeal under Title 28 U.S.C.A. §§ 1291 and 1294.

Appellee is a California corporation and maintains its principal place of business in Victorville, California. During the tax years in question the plaintiff was engaged in the business of quarrying and processing for market of limestone at its plant at Victorville, California. It obtained all of its limestone from a quarry owned and operated by it which was located approximately five miles from its plant. This limestone was a medium to coarse grained, crystalline, metamorphosed, friable limestone with an average calcium carbonate content of 99.30 per cent and an average silica content of .46 per cent. The calcium carbonate content of all limestone quarried by appellee was never less than 98 per cent. After extraction, appellee divided the limestone in four uniform and distinct classifications based on relative degrees of whiteness. Finely ground limestone constituted the bulk of appellee's production during the taxable years. This it obtained by fine grinding in either its pebble mill or Raymond mills. Incidental to this primary product, limited quantities of limestone in coarser form were on occasion screened off at earlier stages during the crushing and grinding stages and sold for such purposes as foundry rock in electric furnaces, poultry grits, roofing granules, and for use in stucco and plaster. Of the total limestone quarried 74 per cent was finely ground and was sold to the paint industry. Of the remaining production, eight per cent was sold for roofing granules, two per cent for found-

ry stone, and 16 per cent for stucco and plaster.

The claimed refunds were based on the appellee's contentions that (1) its mineral deposit was a chemical and metallurgical grade limestone entitled to a 15 per cent allowance under Section 114 (b) (4) (A) [26 U.S.C. 1952 Ed., § 114], and Section 453(b) (2) [26 U.S.C. 1952 Ed. § 453] of the Internal Revenue Code of 1939; and (2) all of appellee's operations, including fine grinding and bagging, were ordinary treatment processes normally applied by mine owners and operators in order to obtain the commercially marketable mineral product or products.

The appellant contended in the district court that (1) appellee's mineral deposit, instead of being a chemical and metallurgical grade limestone was "marble" within the meaning of Section 114(b) (4) (A) and Section 453(b) (2), and therefore entitled only to a five per cent depletion allowance instead of the 15 per cent rate; and (2) that "mining" extends only to crushing of the limestone, and that appellee's depletion base, to which the appropriate percentage rate is to be applied in computing its depletion allowance, is only that portion of its gross income which is attributable to crushed stone, and, in any event, that bagging is not an ordinary treatment process and that the income derived from bagging the limestone is not includible in the appellee's depletion base.

The district court found:

(a) That appellee's mineral deposit was chemical and metallurgical grade limestone within the commonly understood commercial meaning of the terms, and not marble within the commonly understood commercial meaning of that term, and that during the calendar years involved it was not economically or commercially feasible for appellee to use any of its limestone in the production of marble;

(b) That appellee could not have commercially operated its quarry or plant at a profit without processing for market its primary product (or products),

limestone finely ground, in either its pebble mill or Raymond mills. Such finely ground limestone constituted the bulk of the production of appellee during the years 1950 through 1953;

(c) All processes applied by appellee to produce said finely ground limestone were the ordinary treatment processes normally applied by mine owners and operators in the ground limestone industry to obtain such limestone. The limestone so processed could not have been commercially marketed by appellee within the market area available to appellee at any earlier stage of processing, since it was not economically feasible so to do. Regarding each whiteness classification there was no commercial market within the market area available to appellee for any mineral product of like kind and grade at any earlier stage of extracting and processing except to the extent of the more coarsely ground limestone of like grade actually sold by appellee. The first commercially marketable mineral product (or products) for the portion of the appellee's limestone so processed was such finely ground limestone ready for shipment at appellee's plant.

(d) Incidental to this primary production, limited quantities of limestone in coarser forms were on occasion screened off during earlier stages during the crushing and grinding processes and sold for such purposes as foundry rock in electric furnaces only, poultry grits, roofing granules, and for use in stucco and plaster. All processes applied by appellee to obtain such coarser forms of limestone were the ordinary treatment processes normally applied by mine owners and operators in the ground limestone industry to obtain such limestone. The coarser forms of limestone could not have been commercially marketed by appellee within the market area available to it except as an incident to the production of said finely ground limestone. Regarding each coarser form in each classification of relative whiteness, appellee sold all of the limestone so processed that it could commercially market within the market

area available to it, nor was there any commercial, i. e., economically feasible, market within the market area available to appellee for any mineral product of like kind and grade at any earlier stage of extracting and processing except to the extent of those coarser forms of the same grade, if any, actually sold by appellee. As to each coarser form, the first commercially marketable mineral product for the portion of limestone so processed was that product actually processed by appellee ready for shipment at appellee's plant.

(e) The ordinary treatment processes applied by appellee to its limestone included loading said limestone for shipment at its plant either in bulk or in bags. Appellee sold in bulk all of its limestone that it could sell commercially, i. e., profitably market within the market area available to it. The greater portion of appellee's production had to be bagged to be commercially marketable. For that portion of its limestone which was sold in bags the first commercially marketable product (or products) was such limestone in bagged form.

(f) Appellee's gross sales of limestone amounted to the sum of $510,647.81 for the calendar year 1951, the sum of $650,459.00 in the calendar year 1952, and the sum of $796,756.99 in the calendar year 1953. Said gross sales represent appellee's gross income from mining its limestone for each year, respectively. No discounts of any kind were given in regard to any of said sales. The selling price for bagged limestone was $1.50 per ton greater than bulk sales, and the cost of the paper bags used was $1.50 for each ton bagged.

The district court concluded:

(a) That all treatment processes applied by appellee to all limestone rock extracted by it were ordinary treatment processes normally applied by mine owners and operators within the meaning of Section 114(b) (4) (A), and that appellee's bagging of a portion of its production so marketed was an ordinary treatment process;

(b) That appellee's commercially marketable mineral product (or products) was that crushed and ground limestone as processed and sold by appellee in varying sizes ready for shipment in bulk and in sacks at appellee's plant;

(c) That under Section 114(b) (4) (A) appellee is entitled to a percentage depletion allowance at the rate of 15 per cent of its gross income from mining.

On this appeal appellant contends that the district court erred:

(1) In holding that appellee's mineral deposit is chemical and metallurgical grade limestone instead of marble, within the meaning of Section 114(b) (4) (A) and Section 453(b) (2), and that appellee is accordingly entitled to compute its depletion deduction by using the 15 per cent rate. Appellant contends that appellee's mineral deposit is "marble" and that appellant is accordingly entitled to compute this depletion deduction by using a five per cent rate of depletion.

(2) In holding that all of the processes applied by appellee to its mineral deposit are ordinary treatment processes normally applied by mine owners and operators within the meaning of Section 114(b) (4) (B), and accordingly holding that appellee's depletion base is the sales price of the mineral as actually processed and sold by appellee. Appellant contends that whether appellee's mineral deposit is found to be chemical and metallurgical limestone or marble, "mining" extends only to crushing, and that appellee's depletion base, to which the appropriate percentage rate is to be applied in computing its depletion allowance, is only that portion of its gross income which is attributable to crushed stone.

(3) In holding, in any event, that bagging is an ordinary treatment process, and that the income derived from bagging the limestone is includible in the appellee's depletion base. Appellant contends that bagging is not an ordinary treatment process, and that the income derived from bagging is not includible in the taxpayer's depletion base.

The Internal Revenue Code of 1939, as amended, in its relevant parts provides:

"§ 23. Deductions from gross income.

"In computing net income there shall be allowed as deductions:

\* \* \* \* \* \*

(m) Depletion.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*"

"§ 114. Basis for depreciation and depletion.

\* \* \* \* \* \*

"(b) Basis for depletion.—

\* \* \* \* \* \*

"(4) Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits.—

"(A) In general.—The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

"(i) In the case of sand, gravel, slate, stone \* \* \* marble \* \*, 5 per centum."

\* \* \* \* \* \*

"(iii) in the case of metal mines, \* \* \* metallurgical grade limestone, chemical grade limestone and \* \* \*, 15 per centum, \* \* \*.

" \* \* \* Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

"(B) Definition of gross income from property.—As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plant or mills. The term 'ordinary treatment processes' as used herein, shall include the following: (i) In the case of coal—\* \* \*; (ii) in the case of sulphur—\* \* \*; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of crude mineral product,—crushing, grinding, and beneficiation by concentration \* \* \*[1] The principles of this subparagraph shall also be applicable in determining gross income attributable to mining for the purposes of sections 450 and 453."

---

[1]. The statute also specifically excludes certain processes, (i. e. electrolytic deposition, roasting, thermal or electric smelting, or refining) from "ordinary treatment processes" with respect to the ores covered by clause (iv).

"Sec. 453. Nontaxable income from certain mining and timber operations, and from natural gas properties

\* \* \* \* \* \*

"(b) Nontaxable income from exempt excess output.—

"(1) General rule.—\* \* \*

"(2) Mines in operation during normal period.—For any taxable year, the nontaxable income from exempt excess output of a metal or coal mining property, or of a sulphur, potash, metallurgical grade limestone, or chemical grade limestone mineral property, which was in operation during the normal period shall be an amount equal to excess output of such property for such year multiplied by one-half of the unit net income from such property for such year, or an amount determined under paragraph (1), whichever the taxpayer elects in accordance with regulations prescribed by the Secretary. \* \* \*"

 We consider first appellant's contention that the district court erred in finding that appellee's mineral deposit was chemical and metallurgical grade limestone, and not marble.

Appellant concedes that whether a mineral deposit is "marble" or "chemical and metallurgical grade limestone" is "normally in part a factual question", but states "in this case there is little dispute regarding the facts." Appellant further concedes "that chemically the taxpayer's deposit is chemical and metallurgical grade limestone".

The district court, after hearing extensive evidence from both parties submitted through qualified expert witnesses, published documents of the State of California, Division of Mines, and the United States Bureau of Mines, published scientific and technical articles, and relevant statistics, resolved the conflict and found as a fact that appellee's mineral deposit was chemical and metallurgical grade limestone within the commonly understood commercial meaning of the terms, and not marble within the commonly understood commercial meaning of that term. In United States v. Wagner Quarries Co., 6 Cir., 1958, 260 F.2d 907, the sole question presented was whether the taxpayer should be allowed a ten per cent depletion allowance under Section 114(b) (4) (A) (ii) on the contention of the government that the taxpayer's deposit was calcium carbonate (ordinary limestone), or a fifteen per cent depletion allowance under Section 114(b) (4) (A) (iii) on the taxpayer's contention that its deposit was "metallurgical grade limestone" or "chemical grade limestone". The trial court found that the taxpayer's deposit was chemical or metallurgical grade limestone. The Circuit Court, in upholding the finding of the trial court, stated at page 908 of 260 F.2d:

"If the District Court's finding that the taxpayer's limestone was of chemical or metallurgical grade within the meaning of the statute, was supported by substantial evidence, the question, as it seems to us, is one of fact."

Under the record in the instant case, we are unable to hold that the finding of fact of the trial court is clearly erroneous unless the court erred in failing to apply Congressional meaning to the terms "marble" and "chemical grade and metallurgical grade limestone". Essentially the contention of appellant is that the trial court so erred. We now proceed to explore such contention.

The Senate Finance Committee, in reporting on paragraphs (i), (ii) and (iii) of Section 114(b) (4) (A), (i) of which includes "marble" in the five per cent depletion rate, (ii) of which includes calcium carbonate (ordinary limestone) in the ten per cent depletion rate, and (iii) of which includes "metallurgical grade limestone" and "chemical grade limestone" in the fifteen per cent depletion rate, states, "The names of the various enumerated minerals are, of course, intended to have their commonly understood commercial meanings." S.Rep. 781, 82d Cong. 1st Sess. p. 38.

This congressionally expressed intent has received judicial approbation and application. South Jersey Sand Co. v. Commissioner of Internal Revenue, 3 Cir., 1959, 267 F.2d 591; Commissioner of Internal Revenue v. Quartzite Stone Company, 10 Cir., 1959, 273 F.2d 738.

Congress recognized that there may be overlapping of the designations given to the variously enumerated minerals and provided for such situations. The House Conference Report (approved by both Houses of Congress) stated that:

"Under the conference agreement calcium carbonates (ordinary limestone) are granted an allowance of 10 percent, while marble, which is a calcium carbonate, receives 5 percent. It is intended, in any case where a mineral is specifically provided for at a stated rate of percentage allowance, that the specific provision will govern over the allowance provided (whether higher or lower) for a more general classification." H. Conference Rep. No. 1213, 82d Cong., 1st Sess., p. 75.

It is appellant's argument that since petrologically marble is limestone which has been recrystallized through metamorphism resulting in a crystalline limestone which is physically distinguished from ordinary limestone by its crystalline and granular texture, that appellee's deposit is marble because of the district court's finding that the appellee's deposit was "a medium to coarse grained, crystalline, metamorphosed, friable limestone" unless the commonly understood commercial meaning of "marble" is different from its petrological meaning.

The record reflects that appellee's deposit is not suitable for the production of dimension marble. Appellant asserts that such deposit is suitable in crushed form for terrazzo, marble mosaic, and so forth, and that marble, as commonly understood commercially, includes crushed marble. There is substantial evidence in the record that appellee's deposit is too fractured, stained, unsound, and too irregular in grain size to be classified as marble in the commonly understood commercial sense of that term. Appellant asserts that since the testimony which sought to extend the depletion allowance to stone, i. e., "igneous rocks such as granite, syenite, diorite, basalt, and other trap rocks such as limestone, dolomite and sandstone; and metamorphic rocks such as gneiss, schist, eclogite, and marble," was presented to the appropriate committees of Congress by the representatives of the crushed rock industry, and since there was an absence of such testimony from members or representatives of the dimension stone industry in relation to either limestone or marble that it must be presumed that it was the intent of Congress to include crushed marble within the commonly understood commercial meaning of the term "marble". There is in the record evidence which indicates that members of the crushed stone industry classified crushed marble solely as by-products from dimension marble quarries, and do not consider the substantial tonnage of metamorphosed limestone as commercial marble. We have examined the testimony quoted at length in the appendix to appellant's brief, and we are far from persuaded that any such presumption may be properly drawn. The crushed stone industry sought a depletion allowance of fifteen per cent to the crushed stone industry. The representatives of the limestone industry sought a fifteen per cent depletion allowance for metallurgical and chemical grade limestone. Congress acted and granted a five per cent rate to marble, a ten per cent rate to ordinary limestone, and a fifteen per cent rate to chemical and metallurgical grade limestone. We find nothing in the legislative history to lead us to believe that Congress adopted a standard which would compel the classification of appellee's deposit as "marble" within the commonly understood commercial meaning of that term.

There is direct testimony by experts for appellant that appellee's mineral deposit is marble according to the commonly understood commercial meaning of that word. There is likewise direct testimony from the experts of appellee that

appellee's deposit is chemical and metallurgical grade limestone within the commonly understood commercial meaning of that term.

The record discloses that appellee's deposit had an average calcium carbonate content of 99.30 per cent, and an average silica content of .46 per cent, and that it was capable of use for metallurgical and chemical purposes. In fact, the great bulk of appellee's product was sold to the paint industry.

Appellant states that "marble is plainly a more specific category than limestone (of any grade)" and that "marble is plainly a more specific classification than chemical or metallurgical grade limestone." From this statement appellant argues that the designations "marble" and "limestone" are overlapping, and that since the statement appearing in the House Conference Report quoted supra requires that the specific provisions shall govern over the allowance provided (whether higher or lower) for a more general classification that appellee's deposit must be classified as "marble". The only evidence in the record on this subject which has been called to our attention is contrary to appellant's statement that "marble" is a more specific classification than "limestone". According to such evidence, the classification going from the most specific to the most general is as follows: (1) metallurgical grade limestone; (2) chemical grade limestone; (3) marble; (4) limestone; (5) calcium carbonates; and (6) stone.

We find no misapplication by the district court of Congressional intent. The assailed findings of the district court are supported by substantial evidence. We are unable to say they are clearly erroneous.

We now consider appellant's second contention that appellee is not entitled to compute its non-taxable income for excess output for excess profits tax purposes under Section 453(b) (2), since its deposit is not chemical or metallurgical grade limestone. The parties agree that the determination of the issue of whether appellee's deposit is chemical grade and metallurgical grade limestone is dispositive of the issue now being discussed. Since we have held that the district court's determination that appellee's deposit is chemical grade and metallurgical grade limestone must be sustained, it follows that appellee is entitled to compute its non-taxable income for excess output for excess profits tax purposes under Section 453(b) (2).

We now consider together appellant's third and fourth contentions, the latter of which is an alternative one. Under its third contention appellant urges that the trial court erred by holding that appellee's depletion allowance is to be computed for each year in question by applying the appropriate percentage rate of depletion to its gross income in each year derived from the sales prices of the products it actually sold. It is appellant's position that appellee's depletion allowance for each year must be computed by applying the appropriate percentage rate of depletion only to that portion of appellee's gross income which is attributable to crushed stone. Under its fourth contention appellant urges that in any event the district court erred in including in appellee's depletion base appellee's income attributable to bags and bagging.

As part of the pretrial conference order, the following facts were admitted without requirement of proof:

"(7) All calcium carbonate rock produced by plaintiff is of substantially the same chemical nature. All of said calcium carbonate rock is of substantially the same physical nature except for a variation in texture due to differences in grain sizes. Due to soil stains, slight intrusions of iron bearing rock and the like, it will occasionally grind into finished products with some slight discolorations. At the quarry, the whitest material is segregated and designated by plaintiff as Grade No. 1. This grade is supplied to paint, putty, ceramic and other industries where color is extremely important. Slightly stained calcium carbonate

rock is designated by plaintiff as Grade No. 2. Grade No. 2 is supplied primarily for use in water paints, stucco, plaster and roofing granules. Calcium carbonate with discolorations somewhat darker than Grade No. 2 is designated by plaintiff as Grade No. 3 and is supplied primarily for use in rubber floor tile, oil well drilling and the like. The balance of plaintiff's calcium carbonate rock is designated by plaintiff as Grade No. 4 and is supplied to users where color is of no importance, such as asphalt paints, asphalt roofing, pipe coating and stock feed. Color control is maintaind by plaintiff by constant checking on a reflectometer or brightness meter."

The processes employed by appellee in arriving at the products which appellee sold are set forth in the pretrial conference order as follows:

"(8) The following processes were employed by plaintiff during the years in question:

"(a) The calcium carbonate rock is extracted at the quarry, trucked to a crusher located at the quarry and carried on a conveyor belt (from which unsuitable rock is picked out by hand) into two more jaw crushers at the quarry which further reduce the size of the calcium carbonate rock. Said calcium carbonate rock is then kept in bins at the quarry according to its grade. Plaintiff's trucks load the calcium carbonate rock from said bins and carry it to plaintiff's mill, a distance of approximately five miles.

"(b) Upon reaching plaintiff's mill said calcium carbonate rock is placed in a mill storage bin according to grade. Calcium carbonate rock from these bins proceeds through a hammer mill where it is reduced in size to a minus $\frac{1}{8}$th of an inch. From said hammer mill said calcium carbonate rock proceeds to appropriate storage bins and then to either the Raymond mill or the peb-

ble mill, where said calcium carbonate rock is ground to a very fine state. All grades of plaintiff's calcium carbonate rock are processed in the same manner except that Grades Nos. 3 and 4 are processed only through the Raymond mill.

"(c) As and when orders for roofing granules are received, plaintiff transfer sufficient calcium carbonate rock out of the Grades Nos. 1 and 2 mill storage bins and onto a trommel screen which screens out calcium carbonate rock of a size plus $\frac{1}{8}$th of an inch to a minus $\frac{3}{8}$ths of an inch for use as roofing granules.

"(d) As and when orders for foundry rock are received, plaintiff transfers sufficient calcium carbonate rock out of the Grade No. 3 mill storage bin, onto a two-decked screen and obtains calcium carbonate rock of a size of plus $\frac{3}{4}$ths of an inch from the top screen, which is sold as foundry rock; the balance of the calcium carbonate rock is returned to said storage bin.

"(e) As and when orders for calcium carbonate rock for use in stucco and plaster are received, plaintiff diverts sufficient calcium carbonate rock of Grades Nos. 1 and 2 passing through the hammer mills to screens and obtains calcium carbonate rock of varying size for use in stucco and plaster.

"(f) During the years in question plaintiff sold the calcium carbonate rock ground by the Raymond and pebble mills and the calcium carbonate rock for use as roofing granules and stucco and plaster in bags and in bulk as set forth in Paragraph 10 below. Said foundry rock was sold in bulk."

Paragraph 10 is as follows:

"(10) Plaintiff during said years, 1950 through 1953, sold its calcium carbonate rock both in bulk and in bags. Said sales in bags represented approximately 64% to 80% of its

total sales revenues. The sales of bulk and bagged products during the years 1951 through 1953 were as follows:

| | 1951 | |
|---|---|---|
| Bagged | 33,907.00 tons | $422,600.42 |
| Bulk | 11,794.18 tons | 88,047.39 |
| | 1952 | |
| Bagged | 39,944.51 tons | 479,958.78 |
| Bulk | 23,206.42 tons | 170,500.22 |
| | 1953 | |
| Bagged | 50,205.56 tons | 591,780.02 |
| Bulk | 30,113.60 tons | 204,976.97 |

"All of said prices are F.O.B. the Victorville plant."

———————◆———————

Appellant concedes that said processes through the primary crushing at the quarry constitute the treatment processes normally applied by mine owners or operators of deposits similar to appellee's in order to obtain the first commercially marketable mineral product of such deposits. The district court determined that the balance of said processes also constitute ordinary treatment processes normally applied by mine owners and operators having similar deposits in order to obtain the first commercially marketable mineral product or products.

■■ At the outset we will dispose of appellant's fourth or alternate contention that, in any event, the district court erred in including in appellee's depletion base income attributable to bags and bagging. We are convinced that the rationale of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581, excludes income from such source in arriving at appellee's depletion base. Bags and bagging are not required in order to obtain the commercially marketable mineral product. Income attributable to bags and bagging should have been excluded, and the district court erred in including the same.

The district court decided the instant case before the Supreme Court announced its decision in Cannelton. Cannelton makes it clear that profitability to an individual miner is not a factor to be considered in order to obtain the commercially marketable mineral product or products. Throughout the findings appear the expressions "economically or commercially feasible", "at a profit", "economically feasible", and "profitably". Throughout the entire record it is crystal clear that the district court interpreted and applied the phrase "commercially marketable mineral product or products" to mean profitable—at a profit. Clear error was committed by the district court in so doing. The district court's excusable misconception of the law on this point vitiates findings of fact (b), (c), (d) and (e) supra, and the conclusions of law based thereon.

■ Since this case must be remanded to the district court, we believe it appropriate to state that, in our view, under the rationale of Cannelton, in determining the cutoff point where mining ceases for depletion purposes, uniform treatment must be accorded to all miners engaged in the same branch of the mining industry.

The judgment of the district court is vacated and the cause is remanded to the district court for reconsideration and redetermination, and the making of findings of fact and conclusions of law in the light of and consistent with the views herein expressed, and for the entry of a judgment based thereon.