**E. O. BOOKWALTER, District Director of Internal Revenue, Appellant,**

v.

**CENTROPOLIS CRUSHER COMPANY, Appellee.**

**No. 16953.**

United States Court of Appeals
Eighth Circuit.

June 27, 1962.

Melva M. Graney, Atty., Dept. of Justice, Washington, D. C., for appellant; Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., Lee A. Jackson and Kenneth E. Levin, Attys., Dept. of Justice, Washington, D. C., and F. Russell Millin, U. S. Atty., Kansas City, Mo., with her on the brief.

James E. Burke, Kansas City, Mo., for appellee; Donald E. Willson and John A. Biersmith, Jr., Kansas City, Mo., with him on the brief.

Before VOGEL, VAN OOSTERHOUT and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

Centropolis Crusher Company (taxpayer) is engaged in the business of mining, processing and selling metallurgical or chemical grade limestone, a term generally applied in the industry to high-grade limestone that contains a relatively high calcium carbonate content. Taxpayer instituted this action against the District Director of Internal Revenue, hereinafter referred to as "Director," to recover the amount of income taxes allegedly overpaid for the years 1950 through 1953, on the theory that it was entitled to a greater percentage depletion allowance under § 114 (b) (4) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114(b) (4) than allowed by the Director. The matter was tried to the court on evidence presenting no substantial factual conflict. The trial court found in favor of the taxpayer. Centropolis Crusher Company v. Bookwalter, D.C., 168 F.Supp. 33, and this court affirmed at 272 F.2d 391, partially on the basis of our opinion in Commissioner of Internal Revenue v. Iowa Limestone Company, 8 Cir., 269 F.2d 398. Action was withheld on the Director's petition for rehearing until the decision by the Supreme Court of the United States in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581. In light of the opinion in Cannelton, which specifically found the "profitability test" applied in Iowa Limestone Co. unacceptable, we vacated our prior ruling and reversed the judgment of the district court and remanded the cause "for the taking of additional evidence, if deemed necessary, for further findings of fact and conclusions of law, and the entry of a judgment upon the basis thereof, consistent with the teachings of the Supreme Court in United States v. Cannelton Sewer Pipe Co. * * *." Bookwalter v. Centropolis Crusher Company, 8 Cir., 281 F.2d 798, 799. On remand, the district court, ruling that further evidence was neither necessary nor appropriate, reaffirmed the prior findings which were in controversy on the first appeal, entered supplemental findings of fact and conclusions of law, and again entered judgment in favor of taxpayer, and it is from this judgment that the Director has appealed.

The Internal Revenue Code of 1939, 26 U.S.C.A. § 23, provides that certain deductions may be taken for depletion, and by § 114(b) (4) (A) (iii) a 15% depletion allowance is made for chemical grade limestone, to be applied to "gross income from the property." By subparagraph (B) of § 114(b) (4), gross income is defined as "gross income from mining." The statute then continues:

"The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also *the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *.* The term 'ordinary treatment processes', as used herein, shall include the following:

"(i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the case of sulphur—pumping to vats, cooling, breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of

processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores." (Emphasis supplied).

The controversy on this appeal is the same as that presented on the first appeal, 272 F.2d 391—whether or not the trial court erred in allowing the taxpayer to include in its "gross income from mining," the income received from sale of its finest ground limestone.[1] The issue of depletable income as to bagging the product was ruled against taxpayer, and is not now before this court.

In mining the stone, the taxpayer's processes were as follows: after blasting, the rough limestone is taken from the mine, hauled by truck and dumped into a "primary crusher," where it begins a process which renders it into eight distinct and uniformly graded sizes known as 2", 1¼", ¾", ½", ⅜", buckshot, dust, and "finely ground." It appears that this process is entirely automatic; that the stone passes from the primary crusher over the first screen which separates out all stones over 2"; that a continuous belt passes the product to a "secondary crusher," then over and along various other screens which divert the stone into separate bins, according to the aforementioned sizes, and the rock continues to pass through the secondary crusher until all stones are reduced in size to at least 2". From the "dust bin," some portions of the limestone pass by another conveyor belt to a "Raymond roller mill" which reduces the stone so that 90% of it will pass through a "200 sieve" (200 apertures per square inch), thus producing the "finely ground", here in issue. The evidence establishes that taxpayer's limestone is of a very rare chemical grade; that all sizes of the product are required by the trade; that the finely ground product is required for all chemical uses; that during the taxable years in question the finely ground stone accounted for approximately 20% of taxpayer's sales, while 80% of the product was sold in coarser grades.

Upon the evidence the court initially made and entered eighteen separate findings of fact, and since they are reported at 168 F.Supp. pp. 34–35, full repetition thereof is unnecessary.

The supplemental findings are:

a) "The business of plaintiff, as heretofore found, was the mining and marketing of metallurgical and chemical grade limestone, plaintiff is a miner and not an integrated miner-manufacturer."

b) "The single operation of reducing without chemical or other change chemical and metallurgical grade limestone to the sizes above noted was the only process applied by the plaintiff to its crude mineral product prior to the sale thereof." [2]

c) "All of the processes applied by plaintiff were the processes normally applied by even non-integrated miners of chemical and metallurgical grade limestone to obtain a marketable product regardless of whether the price at which the product so processed was marketed would be a profitable or unprofitable one to a particular miner or operator."

d) "Chemical grade limestone is normally crushed before it is sold."

e) "Limestone is not marketable without prior reduction to various graded sizes; the ordinary miner of chemical and metallurgical grade limestone ships the product of his mine in such form."

In its supplemental conclusions of law, the trial court held that the "profitability test" had not been applied in arriving at the conclusion that the taxpayer's processes were the "ordinary treatment proc-

---

1. As indicated in the opinion (later withdrawn), 272 F.2d, at pp. 393, 394, our initial affirmance was premised in part on Commissioner v. Iowa Limestone Co., where we discussed and applied the "profitability test." Thus we did not explicitly determine what taxpayer's proper depletion base was independent of the element of profit.

2. The sizes referred to by the trial court, are set out in its initial finding No. 10, as 2", 1¼", ¾", ½", ⅜", buckshot, dust and "finely ground."

**30**

esses normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products."

The Director insists that the teachings of the Supreme Court in Cannelton, supra, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed. 2d 1581, compel a holding that the "cut-off" point in taxpayer's operations is after the seventh size, dust, was obtained, and that the Raymond roller mill operation which produced the "finely ground" material should be excluded from "mining" because it is a process applied after the "commercially marketable mineral product" was obtained. The Director seeks to differentiate between *crushed* limestone, which he recognizes includes the seventh size termed "dust," and *ground* limestone, contending that *crushed* limestone under Cannelton was the first marketable product obtained, because approximately 80% of taxpayer's mineral was sold without the final process of fine grinding. We cannot escape believing that there is a fundamental inconsistency in the concession that the first seven sizes, 2″ to and including dust, collectively, are the first "commercially marketable product" inasmuch as the evidence establishes that there is a market for each of the eight sizes, including the coarse 2″ material. Indeed, taxpayer's president testified that in 1951, 1952 and 1953 approximately 15%, 12% and 16%, respectively, of taxpayer's sales were of what is known in the industry as "crusher run" or unsorted stones. If the Director's interpretation of Cannelton as applied here is sound, then it could be said with more logic that the cut-off point, when the mineral was first marketable to the trade, literally would be after the first process of primary crushing.[3] However, as hereinafter discussed, we do not read Cannelton in its narrow, limited sense, as the Director would have us do.

We deem it of some interest to note that under the 1954 Code, as amended,

the whole problem of defining "ordinary treatment processes" and the concept of "commercially marketable mineral product" will no longer trouble the courts, for although the 1954 Code, as enacted, carried forward the old definition of mining in this form [26 U.S.C.A § 613(c) (2)], in 1960 the statute was amended in its entirety to drastically redefine the term "mining," as being limited to specifically stated processes set out by Congress. 26 U.S.C.A. § 613(c) (2) and (4). The permissible processes listed in § 114(b) (4) (B) (iii) and (iv) of the 1939 Code, were carried forward, with additional specifications for particular minerals. Thus, for calcium carbonates and other minerals used in making cement, it was provided that all processes prior to induction into the kiln were within the definition of mining [§ 613(c) (4) (F)], and as to clay used to manufacture brick, tile and kindred products, crushing, grinding, and separating the mineral from the waste were to be within the definition of mining. [§ 613(c) (4) (G)]. As to the cement industry, the Code was further amended to allow an election for application of the 1960 amendment to tax years subject to the 1939 Code. Pub.Law 86–564, § 302(c), 74 Stat. 1018, 26 U.S.C.A. § 613 note.

In 1961, further "retroactive legislation" was adopted, apparently to overcome the effect of Cannelton upon brick and tile clay, fire clay and shale used in making clay products (Pub.Law 87–312, 75 Stat. 674, approved September 26, 1961, 26 U.S.C.A. § 613 note); and, as to quartzite and clay used in production of refractory products (Pub.Law 87–321, 75 Stat. 683, approved September 26, 1961, 26 U.S.C.A. § 613 note), the amendments to be considered as a part of the 1939 and 1954 Codes. See discussion, April 1962 Supplement, Vol. 4, Merten's Law of Federal Income Taxation, Zimet Edition, pp. 44–52.[4]

---

**3.** It may well be that the Director was motivated in fixing the cut-off point immediately before the Raymond roller mill operation because the material produced by that operation sold for approximately

$5 per ton in bulk, while that obtained for other crushed sizes was from $1.48 to $1.50 per ton.

**4.** The effect of these amendments in the "clay products" industry was to provide

In addition to these significant changes by legislation, we note that the Director has had some difficulty in determining and defining processes properly within the definition of "mining." Thus, by Revenue Ruling 61–17, 1961–1 Cum.Bull. 193, issued after the Cannelton decision, the Director first fixed the cut-off point for limestone at *primary* crushing, all subsequent processes being disallowed. Subsequently, because of "substantial differences in the physical structure of rock and * * * the wide variety of types and methods of size reduction processes used in producing broken and crushed stone" the Director, by Rev.Ruling 62–5, 1962–3, January 15, 1962, has now included within the meaning of "ordinary treatment processes" (for years prior to January 1, 1961) all processes prior to "fine pulverization," the latter point being set in reference to allowable reduction in size to "No. 20 screen (U. S. Standard Sieve Series)."[5] Remembering that under the 1939 Code chemical grade limestone is recognized as a specific mineral, we observe with some interest that this ruling is designed to cover "crushed rock for road ballast," "agricultural limestone," and "granite and other stone sold as broken or crushed rock or stone products," as well as "chemical grade limestone."

It appears that the effect of the Cannelton decision has been the concern of several courts in cases of recent date, and the Director has cited numerous decisions applying the principles of Cannelton in support of his position. See United States v. Portland Cement Company of Utah, 10 Cir., 293 F.2d 826 (miner of "cement rock" crushed and ground stone, mixed it with water, kiln dried and then reground into cement); Riddell v. Victorville Lime Rock Co., 9 Cir., 292 F.2d 427 (remanding to district court for re-consideration of its rulings based upon a "profitability test"); C. I. R. v. Halquist, 7 Cir., 291 F.2d 49, cert. den. 368 U.S. 930, 82 S.Ct. 367, 7 L.Ed.2d 193 (cutting and processing dolomite dimension stone into veneer building material, taxpayer's "principal product." In addition to cutting his own quarry stone, evidence indicated that taxpayer purchased rough uncut stone from other quarries for processing in his plant); Standard Realization Company v. United States, 7 Cir., 289 F.2d 247, (miner of quartzite processed mineral by washing and drying to remove cement binder, then grinding to produce "silica flour" of fine grade. The court disallowed Government's contention that the first commercially marketable product under Cannelton was the crude, unwashed sand, but set a "cut-off point" prior to grinding); Winnsboro Granite Corporation v. C. I. R., 4 Cir., 283 F.2d 307, (involved depletability of income from value of transportation costs added after stone loaded for shipment at quarry); Riddell v. California Portland Cement Company, 9 Cir., 297 F.2d 345, (integrated miner-

---

for an election, whereby, under certain conditions, an integrated miner-manufacturer would be entitled to depletion allowances upon a percentage of his gross income from the *finished product*.

5. Revenue Ruling 62–5, '62 Vol. 7 CCH ¶ 6239, p. 71,082, provides in part:

"In the case of chemical grade limestone, agricultural limestone, granite, and other stone sold as broken or crushed rock, processes (other than fine pulverization) applied to reduce those materials in size will be treated as ordinary treatment processes for taxable years beginning before January 1, 1961.

"The term 'fine pulverization' does not include the coincidental production of fines as a by-product of allowable size reduction processes nor does it include any process applied in reducing the product in size so that it will pass a No. 20 screen (U. S. Standard Sieve Series) provided 5% or more of the product of such process will remain on a No. 45 screen (U. S. Standard Sieve Series). U. S. Standard Sieve Series is the same as ASTM designation E–11–61. Separating or screening the material for size prior to fine pulverization will be considered an allowable process."

There is no evidence in the record to indicate whether all of the first seven of taxpayer's sizes (2″ to "dust") pass the "No. 20 screen" test, the Director pointing out specifically only the fact that the "fine ground material in issue is not within the Ruling. The evidence indicates that taxpayer's Raymond roller mill is not a "pulverizer," or "Ball mill" which would reduce material to a "325 mesh" size.

manufacturer of cement, applying relief provisions of Pub.Law 86–781, 26 U.S.C. A. § 613(4), with optional cut-off point for cement industry at "kiln feed"); Great Bend Brick & Tile Company v. United States, D.C.Kan., 194 F.Supp. 309, (integrated miner-manufacturer processing fire and brick clay into finished brick and tile products, claiming depletion base on finished goods); Scott v. United States, D.C.Ala., 60–2 USTC ¶ 9731, p. 78,022, (there being a market for raw limestone, manufacturer of lime denied benefit of "proportionate profits method" in computing depletion on its lime sales); Fannin Investment Company v. United States, D.C.Ga., 197 F. Supp. 693, (limestone miner crushed stone to 5″ size, then re-crushed and bagged for sale as "terrazzo and marble roofing chips"). Initially, the court was of the opinion that all operations subsequent to primary crushing were in the nature of manufacturing terrazzo chips. The case was re-opened on September 15, 1961, was re-considered in light of Rev. Ruling 62–5, supra, and on the basis of such ruling the court rendered judgment in favor of taxpayer.[6]

But see and compare, Riddell v. Monolith Portland Cement Co., 9 Cir., 301 F.2d 488, ruling that *finished cement* was miner's first commercially marketable product, upon the ground that there was *no* market for taxpayer's stone until processed into cement, and Virginia Greenstone Co., Inc. v. United States, D.C.Va., 61–2 USTC ¶ 9667, p. 81,699, ruling that taxpayer's first marketable product was "sand rubbed finished stone" after cutting, sawing and polishing, there being *no* market for greenstone in the form of quarry block.

We have carefully reviewed each of the cases relied upon by the Director, and find that they are distinguishable upon their facts or of no compelling authority to our decision on the issue before us. We are satisfied that the findings and conclusions of the district court are fully within the applicable statutes, are supported by substantial evidence, and are not contrary to or in conflict with the principles announced in Cannelton.

█ In Cannelton the court was concerned with three factors not present in the instant situation: a) the taxpayer was an integrated miner-manufacturer; b) taxpayer did not market any of the mineral in its raw state, although it was conclusively shown that ⅗ of the fire clay mined in Indiana was sold in its raw state; c) the depletion base claimed in Cannelton was the gross income from a *manufactured* product—vitrified clay tile. In ruling against taxpayer there, which urged that its first marketable product was the finished item, the court struck out all consideration of *profit* in making such determination. However, in its discussion of the *raw mineral* product, the court re-affirmed the principles to be applied under the statute, and at p. 87 of 364 U.S., at p. 1587 of 80 S.Ct. stated: "Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, i. e., where the ordinary miner shipped the product of his mine." At p. 88, 80 S.Ct. at p. 1587, as to ordinary treatment processes, the court ruled that these are "the 'ordinary' normal ones applied by the nonintegrated miner." The court in no way attempted to set out or define what these ordinary processes might be among the several minerals, and it seems obvious that under the language of the 1939 Code, determination of what constitutes the "commercially marketable product," and "ordinary treatment processes" in a given situation depends upon the facts at hand.

As to the issue of determining the "product," it should be pointed out that taxpayer's product here is *chemical grade* limestone. This is not a situation where taxpayer, as an integrated miner-manufacturer, seeks depletion rates on his finished or manufactured product, as was

---

6. In supplemental findings the court found that under Rev.Ruling 62–5, taxpayer's operation in producing terrazzo and roofing chips was an "ordinary treatment process." The Government has appealed from the judgment.

the case in Cannelton. Taxpayer does not manufacture anything—what it sells is the raw mineral product, in assorted sizes. Furthermore, without serious contradiction, the evidence fully supports the trial court's conclusion that in order to procure a market for this high grade limestone, taxpayer in bringing its mineral "to shipping grade and form," was required to reduce the mineral to the eight stated sizes, with "tight" and uniform gradation therein.[7] Chemical grade or metallurgical limestone is a rare mineral deposit.[8] Taxpayer's mineral is not ordinary stone, granite, or marble, subject to 5% depletion allowance [§ 114(b) (4) (A) (i)], nor ordinary calcium carbonate subject to 10% depletion [ibid. (ii)]—it is a specific, and separate mineral, and recognized as such by the 1939 Revenue Code [ibid. (iii)], and given a

depletion allowance of 15%. We deem this factor of importance in any determination of what the commercially marketable product is. Without substantial dispute, the evidence established that regardless of any consideration of profitability, all eight sizes, including "fine ground" are normal, ordinary and necessary gradations to market the mineral in the metallurgical and chemical industries.[9]

As to the trial court's ruling that taxpayer's procedures were "ordinary treatment processes" applied by chemical or metallurgical limestone miners in order to obtain their marketable product, again the record evidence fully supports this conclusion.[10] It should be emphasized that none of taxpayer's processes destroys the physical or chemical identity of the limestone—from the begin-

7. The evidence established that "finely ground limestone," used as a chemical additive in asphalt, is subject to specific quality and size standards by various states.

8. Taxpayer's president testified that of the quarries or mines in the middle west, only 1% or less produce chemical grade or metallurgical limestone.

9. William S. Black, a disinterested and qualified witness, testified:

"Q. And unless you produced all these eight sizes could you market, could you sell a commercially marketable product? * * * A. Well, it would be very impractical, I will say, impossible, to sell any one or two of those. It would take, in order to satisfy the requirements of the customers, it would require that you produce all.

* * * * *

"Q. In other words, speaking of your production of limestone, do you get a commercially marketable product unless you produce all these graded sizes? A. I would say, no."

Vansten H. Ryan, Professor of Chemistry at Rockhurst College, testified:

"Q. Now, for example, we have here eight different sizes of limestone (indicating), produced by this company as its marketable product. Could you use the two-inch in the chemical industry? A. I don't know of any that does no, sir.

"Q. As a matter of fact, do you know of any chemical industry that could use

less than the finely ground? A. Right offhand, no, sir.

"Q. Most of them require it? A. Yes, sir.

"Q. Is that true of the metallurgical industry? A. Yes, sir.

"Q. Just tell the Court, for example, the chemical uses, just briefly, of the finely ground limestone, such as is in the smallest jar here (indicating), which shows the fine grind. A. Well, it is used in the metallurgical industry; it is used in making up lime; it is used in the making, the mixing with asphalt in different degrees for different end products; it has a very wide use; used in mixing animal feed, food supplements. It is gaining wide spread usage in the fertilizer industry as a carrier."

10. H. C. Krause, an operator of another limestone quarry, qualified as an expert consultant to owners of other quarries throughout the United States, testified:

"Q. Now, Mr. Krause without going over it in tedious detail, you are familiar with and you have heard the description here of Mr. Campbell; was that accurate? A. It is.

"Q. With the primary crusher, the secondary crusher, the auxiliary hammermill and eventually the roller mill. I will ask you whether or not, in your opinion, all of those processes, including the roller mill, are ordinary treatment processes normally applied by mine owners and operators in order to obtain the commercially marketable mineral product or products? A. That is correct."

**34**

ning, at the quarry, to the final step, "fine grinding"—the product is still limestone, and nothing else—nothing has been added, subtracted, or mixed. See Cannelton, supra, 364 U.S. at pp. 85–86, 80 S.Ct. at p. 1586, where the Court observed " * * * none of the permissible processes [set out in § 114(b) (4) (B) (i–iv) ] destroy the physical or chemical identity of the minerals or permit them to be *transformed into new products*." (Emphasis supplied). Again, at p. 87, 80 S.Ct. at p. 1587, the Court stated: " * * * 'Obviously it was not the intent of Congress that those processes which would take your products *and make them into different products having very different uses* should be considered, as the basis of depletion.'" (Emphasis supplied).

We are satisfied that the trial court's findings were supported by substantial evidence, in the main, undisputed —and they were not induced by an erroneous view of the law.

Accordingly, the judgment is Affirmed.