JoNes, Chief Judge,
delivered the opinion of the court:
Plaintiff, an Illinois corporation having its principal place of business in Chicago, is engaged in the pursuit of extracting, processing, and selling salt in its various forms and grades. As a salt producer, plaintiff is entitled to deduct from its income and excess profits taxes amounts based upon an allowance for the depletion of its mineral resources. Plaintiff seeks a refund of its taxes for the years 1951,1952, 1953, and 1954 on the ground that it was not permitted to base its computations for depletion allowance on its gross income derived from the sale of finished products in those years. Taxpayer’s claim for the first three years in question is predicated upon the provisions of the Internal Revenue Code of 1939 while its 1954 claim is derived from similar provisions of the Internal Revenue Code of 1954.
Section 23 (m) of the Internal Revenue Code of 1939[1] provides for a reasonable depletion allowance for the mineral mining industry according to regulations to be prescribed by the Commissioner of Internal Revenue. The basis for this depletion allowance is as set forth in section 114[2] of that Code, and establishes that sodium chloride *642 (salt) is to be depleted at 5 per centum of the gross income from the property during the taxable year.. Such “gross income,” the Code explains, means “gross income from mining.” Mining includes “not merely the extraction of ores or minerals from the ground but also the ordinary" treatment processes normally applied by the mine owners or operators in order to obtain the commercially marketable, mineral product or products.” These same provisions are carried forward essentially unchanged into the Internal Revenue Code of 1954, except that the depletion rate for sodium chloride is increased to 10 percent.[3] For simplicity, then, we shall treat all plaintiff’s claims as though they arose under the earlier statutory provisions.
The sole issue [4] presented for decision in this case arises from plaintiff’s contention that all of its processes, including the packaging of its salt, are “normally applied” by miners in order to obtain a commercially marketable product within the meaning of the depletion statute and associated Treasury Regulations.[5]
*643 Plaintiff produces salt by hydraulic mining (brine wells) and dry mining (rock salt mines). The salt so produced falls into three basic categories: evaporated granulated salt, evaporated flake or grainer salt, and rock salt. The rock salt is produced by the dry mining method while both of the evaporated forms, basically, are produced by applying a heat evaporation process to the salt received in solution from the brine wells. These mining methods, with minor variations, are identical with those employed by other members of the salt industry. Since there are few secrets within the industry and since the systems are basically simple in principle, standardization is widespread. The process of dry mining, for example, has not been substantially changed in more than 50 years. As the parties have stipulated, and the trial commissioner has found, the treatment processes applied by plaintiff at its plants, with respect to the three basic types of salt, were as follows:

*644 Plaintiff takes the position that its production cycle is closed and continuous. As plaintiff’s counsel expresses it, plaintiff
* * * starts out with sodium chloride underground, it moves its sodium chloride through a closed production circuit with gravity as the important propelling factor and at the end of that production circuit it loads its sodium chloride products on broad transportation units at its plants. [Brief for the petitioner, p. 46.]
This position is the fabric of petitioner’s ultimate contention that it is entitled to a depletion allowance computed by taking the permitted percentage of its net sales of all its salt products, and that net sales equal gross income from those sales less returns, allowances, freight, warehousing, and salt purchased for resale. Defendant, on the other hand, maintains that plaintiff’s crude extraction product is brine at the wellhead (in the case of brine wells), and rock salt from the muck pile (in the dry mining operation). If this contention were adopted with its full implications, plaintiff would be restricted to an allowance based upon only that percentage of gross income attributable to the mining of salt to these points and no further. Alternatively, the Government contends that all processes through drying and screening (step 6 for the evaporated salts and step 7 for rock salt, Table 1, supra) are allowable,[6] but that percentages of gross income attributable to the introduction of additives, compressing, and packaging are excluded. For reasons hereinafter set forth, we adopt the latter position.
Depletion at its inception in 1913,[7] was designed to make an allowance for the exhaustion of the mineral resources of a producer on the basis of the market value of the mineral at the mine. In 1918, the Congress authorized the introduction of the “discovery” concept of depletion.[8] In 1926, because the earlier methods created extreme administrative problems relating to the proper methods of determining “value,” the system of percentage depletion was introduced *645 into the computation of allowances with regard to the gas and oil industries.[9] At subsequent intervals other minerals and mining products were added to the approved list of de-pletable items, sodium chloride being included by section 319 of the Revenue Act of 1951, 65 Stat. 497.
Throughout the long history of depletion, it has been clear that the Congress intended to tax only the income from mining without touching the resources upon which the mine depended. The underlying depletion theory has always been to make an allowance from income for the exhaustion of the wasting assets. United States v. Cannelton Sewer Pipe Co., 364 U. S. 76, 81 (1960). For that reason it is important in this case to determine with accuracy the cut-off point between “mining” and “manufacturing” in the salt industry. The statute specifies that “mining” includes not just the process of extraction but also the processes normally applied by the miners to prepare their product or products for market. Section 114(B) defines “ordinary treatment processes” by means of inclusion.[10] Although sodium chloride is not included as such, we feel that these statutory delineations are helpful in that they indicate the type of processes intended by the Congress to be a part of mining. In each of the four statutory classifications, the allowable processes are directed at preparing crude ores or minerals for earliest sale prior to formal refining. This is emphasized by the express exclusion of thermal or electric smelting, refining, roasting, and other similar processes. Of course it would be arbitrary to insert salt into any one of these classifications at this point, and we do not attempt to do so.
*646 In tbe application of tbe theory to tbe facts, we believe that tbe decision of tbe Supreme Court in tbe case of United States v. Cannelton Sewer Pipe Co., supra, is controlling. In that case the plaintiff mined raw fire clay and shale and manufactured it into a high-grade sewer pipe. The record showed that the Cannelton Company was unable to market raw clay profitably because the cost of transporting the clay to the nearest market alone exceeded the market price for that commodity. It was clear, however, that there did exist a substantial industry-wide market for raw clay. The Supreme Court, in reversing the Seventh Circuit,[11] held that “commercially marketable” did not mean marketable at a profit and that the plaintiff was its own economical market for its raw clay. The result of this was that the Cannelton Company was forced to compute its depletion allowance only on that portion of its gross income attributable to the constructive sale of raw clay to itself.
Defendant interprets this decision as requiring us to locate the cutoff point at the place where the first marketable product of the mine is produced, thus placing a gloss on the statutory language. In Cannelton, raw clay was the first product to be removed from the ground. The Court said:
Ever since the first percentage depletion statute, the cutoff point where “gross income from mining” stopped has been the same, i.e., where the ordinary miner shipped the product of his mine. [United States v. Cannelton Sewer Pipe Co., supra, at 87.]
To determine the character of the ordinary product, it was essential to investigate the nature of the sales of the raw product on an industry-wide scale, and not restricted solely to the practices of the Cannelton Company. In this -regard the Court said:
The findings are that three-fifths of the fire clay -produced in Indiana in 1951 was sold in its raw state. This indicates a substantial marhet for the raw material.
& $ $ $ $
Proof of these sales is significant not because it reveals an ability to sell profitably — which the respondent could not do — but because the substantial tonnage being sold *647 in a raw state provides conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption — in short, they have passed the “mining” state on which the depletion principle operates. [United States v. Cannelton Sewer Pipe Co., supra, at 86. (Emphasis added.)]
This language, taken in the context of that case, makes it clear that the salient feature was the substantial nature of the clay mined. This consideration has been borne out in a whole series of subsequent cases[12] and it controls the instant case.
We shall first consider the hydraulic mining aspect of plaintiff’s operations. Because the Commissioner of Internal Revenue assessed the plaintiff on the assumption that step 6, Table 1, was the proper cutoff point in the computation of depletion allowance for the brine well production of salt, we are not in a position procedurally to consider whether the proper cutoff point should be placed prior to step 6. We need only decide whether, in the light of Cannelton, it should be located at some later point so as to include some or all of the additional steps.
' To take 1954 as a typical year of the period in question, some 12 million short tons of brine were sold or used in comparison with approximately 8% million tons of salt in the dry form.[13] It is true that this large quantity of brine was used chiefly by chemical companies which produced brine for their own use, and not for sale to others. It is also true that in the years in question, plaintiff produced little or no brine for sale. But the Cannelton case teaches us that these considerations are immaterial. To borrow from the language of that case, modified to our own use, these sales are significant “because the substantial tonnage being sold in *648 a raw state provides conclusive proof that, when extracted from the [ground], the [salt] is in such a state that [it] is ready for industrial use or consumption.” Thus at stage 6, if not sooner, salt was produced in substantially marketable quantities within the meaning of the statute.
We now consider the dry mining portion of the case. An examination of the record shows that out of approximately 20 million tons of salt produced annually between 1951 and 1954, roughly 5' million tons were rock salt. While plaintiff produced a very low percentage (1.30 percent average) of rock salt for sale prior to step 10, four other major producers [14] in those same years sold about half of their total production in bulk form at step 7 of the dry salt process. Since there is no showing of any appreciable sales in the industry prior to this step, we conclude that this is the proper cutoff point, as determined by the Commissioner of Internal Eevenue, for salt produced by dry mining.
Plaintiff would have us distinguish the Cannelton decision on the ground that the producer in that case was integrated, while plaintiff herein is a nonintegrated producer. While it is true that plantiff does not utilize its salt in the production of any other product that is chemically or physically different, there is some doubt as to the validity of that conclusion. Be that as it may, we believe the distinction to be without legal significance. It is apparent that the Supreme Court referred to the integrated nature of the producer in Cannelton only for the limited purpose of showing that the integrated producer was entitled to no benefits superior to its nonintegrated counterparts. United States v. Cannelton Sewer Pipe Co., supra, at 86-87. There is no such distinction suggested by section 114 of the Code. In addition, we find the pre-Cannelton cases stressed by plaintiff to be unpersuasive in this case. As indicated by the Supreme Court, these cases for the most part go off on concessions not present in our case, or they are predicated upon the misconception corrected in Gannelton that for a product to be commercially marketable, its sale must produce a profit to the *649 plaintiff.[15] By comparison, the post-Oannelton decisions[16] are consistent in their nonsupport of plaintiff’s contentions.
As we have previously stated, the procedural aspect of this case constrains us to agree with the Commissioner of Internal Revenue that all processes subsequent to screening and drying be disallowed; thus, plaintiff’s petition as to Counts I and III must be dismissed. By a stipulation filed June 18,1960, the parties agreed that (1) with respect to the allegations contained in Count II, plaintiff is entitled to recover the amount of the deficiencies paid, together with interest thereon as provided by law, and (2) with respect to the allegations contained in Count IV, plaintiff is entitled to recover an amount equal to 6714 percent of the amount of the deficiency set forth in that count, together with interest thereon as provided by law. For that reason plaintiff is entitled to recover on Counts II and IV of its petition and judgment will be entered to that effect.
The exact amount of recovery will be determined pursuant to Rule 38 (c) of the Rules of this court.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and argument of counsel, mates findings of fact as follows:
1. Plaintiff is an Illinois corporation having its principal place of business in Chicago, Illinois. It produces and sells *650 salt by the methods and in the forms and grades hereinafter described.
’ 2. Plaintiff has kept its accounts on the accrual basis of accounting and made its Federal income tax and excess profits tax returns for the years involved herein on that basis of accounting. It reported on the calendar year basis, which is the basis upon which its books of account were kept.
3. Plaintiff duly filed its income tax and excess profits tax returns for the years 1951, 1952 and 1953 and its income tax return for 1954 with the office of the United States District Director of Internal Revenue (formerly Collector of Internal Revenue) at Chicago, Illinois.
4. Plaintiff produces salt by hydraulic mining (brine wells) and dry mining (rock salt mines) and was entitled to take percentage depletion at the annual rate of 5 percent for the years 1951,1952 and 1953, and at the annual rate of 10 percent for the year 1954. Salt is known chemically as sodium chloride (NaCl).
5. Plaintiff is a member of the salt industry. It is engaged in the extraction, processing and marketing of dry salt (sodium chloride). Sodium chloride is a nonmetallic mineral and is an edible product. In addition to plaintiff, but excepting dry salt producers using the solar method of production, which is not involved here, the principal members of the industry engaged in the production and sale of dry salt during the years involved herein were The International Salt Company, Diamond Crystal Salt Company, Jefferson Island Salt Company, Watkins Salt Company, Hardy Salt Company, Barton Salt Company, Carey Salt Company, Gordy Salt Company, United Salt Company, and Michigan Salt Company. The areas in the United States from which dry salt is produced are generally known as New York, Ohio, Michigan, Kansas, Utah, California, Texas and Louisiana. Plaintiff has a plant in each such producing area.
6. During the years involved herein, plaintiff produced salt by means of hydraulic mining at its plants located in Silver Springs, New York; Port Huron, Michigan; Manistee, Michigan; Rittman, Ohio; Hutchinson, Kansas; Weeks Island, Louisiana; and Grand Saline, Texas; and by means *651 of dry mining at its plants in Weeks Island, Louisiana, and Grand Saline, Texas. Plaintiff also produced salt by means of a solar operation at its plant located in Saltair, Utah, but the gross income from the production of salt at that plant was not included by plaintiff in the depletion computation in its returns. The choice of method of extraction as between hydraulic mining and dry mining depends upon a number of factors such as the quality of the sodium chloride deposit, the depth of the deposit, and the requirements of the proximate market for salt.
7. The basic pattern of plaintiff’s production from its hydraulic mining operation (brine wells) was as follows:
(a) Water was pumped into the sodium chloride deposit which is dissolved and the resulting salt in solution (brine) was pumped to the surface.
(b) From the wellhead the brine was introduced into settling tanks where impurities were precipitated out.
(c) From the settling tanks the brine was introduced into either vacuum pans or open grainer pans, depending upon the type and grade of salt required, and in both cases heat was applied for evaporation purposes.
(d) The salt which had been crystallized in either vacuum pans or grainers was next de-watered and then kiln dried, except for certain amounts which were shipped and sold m bulk form. The amount of such salt sold at this stage in bulk form is hereinafter set forth.
(e) After lain drying, the dry salt was run through screens of various mesh sizes to produce a variety of screen grades.
(f) After the screening operation, all of the following operations would normally take place on a gravity flow basis:
(1) The resulting screen grades, except as noted in (2)and (3) below, were routed into packaging lines, with the package sizes ranging from .4 ounce table salt miniatures to 100 pound bags of salt for industrial uses.
(2) Some of the screen grades were routed through hydraulic presses and other types of compression equipment for the production of 50-pound blocks and small bricks, spools, pellets and tablets.
(3) Some of the screen grades were shipped in bulk form.
(4) Between the screening and packaging or compression operations, various additives, for the purpose of *652 either enhancing the free running qualities of the salt or providing food fortification for human or animal consumption, were mixed with certain portions of the salt moving through the operations described in (1) and (2) above.
(g) The final operation, on a flow basis, moved the salt as to all grades, types and packs into trucks, railroad cars, barges or boats.
8. The basic pattern of plaintiff’s production from its dry mining operation (rock salt) was as follows:
(a) Eock salt was mined in essentially the same manner as is coal, by undercutting, drilling, and blasting.
(b) After the initial extraction operation, rock salt went through a crushing process, either in the mine or above ground, or both.
(c) Following the crushing process, the rock salt was run through screens, after which the fine grade was kiln dried, except for the amounts hereinafter indicated which were shipped in bulk form.
(d) Thereafter, additives were mixed with certain portions of the salt, for the purpose of either enhancing the free running qualities of the salt or providing food fortification for human or animal consumption, and some of the straight screen grades, either with or without additives, were shipped in bulk form while the balance was flowed into hydraulic presses and other types of compression equipment for the production of blocks or into the package line.
(e) The final operation, on a flow basis, moved the salt as to all grades, types and packs into trucks, railroad cars, barges or boats.
9. From the time the brine leaves the bottom of the well in the hydraulic mining operation, or from the túne the rock salt leaves the face of the mine in the dry mining operation, until the final loading operation is completed, there is no chemical change in plaintiff’s product. Regardless of the ultimate type of crystal formation, screen size, grade or pack, the product starts out as sodium chloride and at all stages remains sodium chloride.
10. Plaintiff’s crude extraction product, in the case of hydraulic mining, was salt brine at the wellhead and, in the case of dry mining, was the mining muck pile immediately *653 after blasting. During the years herein involved, plaintiff never sold any brine at the wellhead nor any rock salt from the muck pile. The product was always processed before sale. However, commencing in 1958, plaintiff did sell brine from a plant at Odessa, Texas. Such sales, amounting to approximately 10,000-11,000 tons annually, were made for approximately $6.50 a ton on a dry salt basis. Generally, saturated brine contains approximately 23 percent salt. The plant resulted from the operations of a natural gas company (the El Paso Natural Gas Company) which was developing cavities in the salt strata at that location for the storage of gas. Having no place to dump the brine, plaintiff arranged with the company to take over the installation since plaintiff had two customers located around 1% miles from the salt cavity who were jointly engaged in the production of butadiene rubber products, and in connection therewith could use the brine. All of the brine from this plant of plaintiff’s was sold to these two customers. The salt in place is owned by the natural gas company and the brine is conveyed by plaintiff by pipeline. The only other location from which plaintiff presently sells brine is near Windsor, Ontario. Here, the brine is transported by pipeline to a customer in Detroit, Michigan, which uses it in the production of soda ash. The production, sale and delivery of this brine from Ontario also commenced in 1958. All the brine sold from this plant, consisting of approximately 750,000 tons annually, goes to this one customer (the Solvay Division of Allied Chemical Company). Plaintiff’s general salt mining operations in Canada, which commenced in 1952, are conducted through a subsidiary company.
11. The salt produced by plaintiff during the years herein involved consisted of three basic types, i.e., evaporated granulated salt, evaporated flake or grainer salt, and rock salt. Evaporated granulated salt and evaporated flake or grainer salt were produced in the hydraulic mining operation and the rock salt, in the dry mining operation. The treatment processes applied at plaintiff’s plants to produce plaintiff’s salt products with respect to each of the three basic types of salt were as follows:

*654

During the years involved herein, plaintiff produced evaporated granulated salt at its plants at Silver Springs, New York; Pittman, Ohio; Port Huron, Michigan; Manistee, Michigan; Hutchinson, Kansas; Weeks Island, Louisiana; and Grand Saline, Texas, and it produced evaporated flake salt at its plants at Silver Springs, New York; Pittman, Ohio; Port Huron, Michigan; Manistee, Michigan; Hutchinson, Kansas; and Grand Saline, Texas.
12. Plaintiff's production operations for all three types of salt constitute a gravity propelled continuous flow, closed circuit operation. In the case of evaporated granulated salt and evaporated flake or grainer salt, little salt escaped the circuit until stage 8 (bulk loading) was reached. There was, however, some tonnage sold between stage 4 (de-watering) and stage 5 (kiln drying), the amount so sold being hereinafter set forth. In the case of rock salt, very small tonnages (hereinafter set forth) were shipped on an infrequent basis between stage 4 (conveying and hoisting) and stage 5 (scav *655 enger screening), but no appreciable tonnages escaped the .circuit until stage 10 was reached.
13. Evaporated granulated salt is produced from brine which passes through vacuum pans. The crystals are cube-shaped and relatively small. Plaintiff produces an extra pure evaporated granulated salt, which is 99.9 percent NaCl (sodium chloride) and is identified by plaintiff for marketing purposes as “999.” This high purity granulated salt is produced by exactly the same treatment processes as evaporated granulated except for an additional chemical treatment just after stage 2 to remove certain “impurities” inherently' attached to the salt crystals. This extra pure salt is sold for use in products that would be adversely affected by the presence of such “impurities.” Evaporated flake or grainer salt is produced from brine which passes through open-grainer pans. The resulting crystal aggregates are flake-shaped and medium in relative size. Rock salt consists of cube-shaped crystals which have been knit together in a solid formation by natural conditions. The crystals produced are relatively coarse.
14. (a) In the case of granulated and flake salt, the chemical treatment at or just subsequent to the brine well stage (stage 2) was for the sole purpose of inhibiting or removing certain “impurities” so as to make the brine more readily usable in the operational processes of the plaintiff. In no instance was the aforesaid chemical treatment employed for the purpose of producing, by chemical changes, additional salt, nor was the result of such chemical treatment the production of additional salt, although minute quantities of additional sodium chloride may have been produced incidentally where either magnesium chloride or calcium chloride was one of the “impurities” sought to be removed. The treatment variations between the several plants of the plaintiff were due to the difference in the “impurities” present in the salt at the various locations.
(b) The processes adopted to free the salt from impurities at later stages vary. The salt crystals in themselves do not contain impurities. The impurities are other substances which physically adhere to the salt crystals. These processes result in freeing the impurities from the crystals. This is a *656 physical and not a chemical process. A number of impurities may be removed by simply washing the salt in plain water. Others may be removed in the mechanical process of crushing and screening. The larger the screen size, the less pure the product will be, since during the screening process some impurities fall away.
15. Stage 6 (screening) for granulated and flake salt and stage 7 (screening) for rock salt reflect a physical segregation of salt crystals into various sizes by the use of screens having different meshes. The resulting grades of salt sold by plaintiff were as follows:

The rest of the industry’s dry salt producers used substantially the same screen sizes to produce comparable grades of salt.
16. The various screen grades of dry salt have evolved as a result of the different demands of the various customers *657 for salt. Where the difference in characteristics among the types and grades in respect of chemical purity, rate of solubility, evenness of distribution, adhesiveness, or hardness or softness of crystal structure, is important to the customer, the particular type and grade that satisfies the customer’s requirements is demanded. For example, a relatively coarse grade of rock salt is demanded for ice control on highways because of the particular characteristics of that type of salt; coarse flake or fine flake salt is insisted upon by buttermakers because it provides the proper rate of solubility; and extra pure K. D. granulated (“999”) salt is required by a chemical company which produces metallic sodium through an electrolysis process. Each type of salt has characteristics which differ from the other two types. Within each type the screening process segregates grades by crystal sizes which perform in different ways depending upon the customer’s use.
17. Of the various grades of salt produced and sold by plaintiff, some were sold without additives in bulk, some without additives in packages, some with only product quality additives in bulk, some with only product quality additives in packages, some only in packages, some with additives for specific customer requirements in bulk, some with additives for specific customer requirements in packages, and some in compressed form.
18. At stage 7 for granulated and flake salt and at stage 9 for rock salt, plaintiff mixed certain additives with certain portions of its tonnage. Certain of these additives were employed to meet certain specific customer requirements for the salt products, such as food fortification for animals, the use of iodine for the minimization of endemic goitre in humans, and the reduction of corrosiveness. The cost of these additives was as follows:

Gost of admives for specific customer Year requirements

1954 _$229,075
1953 _ 597,609
1952 _ 508,590
1951_ 436,, 621
The remainder of the additives was employed for the sole purpose of imparting general usable qualities to the salt, such as free running quality and the reduction of caking. The cost of these additives was as follows:

*658
Year Oost of general product quality additives

1954_ $400, 864
1953_
1952_ 315, 733
1951_ 343,217
The use of an. additive does not necessarily increase the cost of the salt to the purchaser. There has, for instance, never been an extra charge for iodized table salt. Plaintiff began adding iodine to table salt in 1924 at the behest of the Michigan Medical Association, which had decided that salt was the best means by which iodine could be administered to prevent endemic goiter in humans. Federal and state agricultural experts decided that salt was the best vehicle for administering trace minerals to animals and educational efforts among farmers caused a demand for trace mineralized salt. The various producers of dry salt use similar additives for similar purposes.
19. The cost of mixing additives for specific customer requirements was as follows:

Oost of miming additives for specific customer Year requirements

1954_$78,500
1953_ 169, 830
1952_163,712
1951_ 140, 969
The cost of mixing general product quality additives was as follows:

Year Oost of miming general produet quality additwes

1954_$177, 786
1953_ 88,975
1952_ 101,666
1951_ 110,851
20. Plaintiff purchased all its packaging material from outside sources in the years 1951,1952 and 1953. In 1954, at its Port Huron, Michigan, and Eittman, Ohio, plants, plaintiff began making its own 26-ounce round cans as a part of its continuous packaging process. In addition to the industry standard 26-ounce round can for table salt, plaintiff began in 1952 to pack table salt in ,4-ounce “miniatures” and in 1954 it added 4-ounce “salters.”
*659 21. With, respect to salt sold for human consumption, plaintiff was required by the Federal Pure Food and Drug Act to label its product, making full disclosure of the product’s contents, and, in order to comply, plaintiff was obliged to package all salt sold directly for human consumption. Most grades of rock salt and some grades of evaporated salt are not marketable for human consumption. With respect to salt with additives sold directly for animal consumption, plaintiff was required by the laws of 42 states to register, and, pursuant thereto, properly to package and label such salt sold for animal consumption. In addition, packaging is essential to protect salt for edible uses against contamination.
22. With respect to salt sold for other than direct human or animal consumption, salt was packaged to facilitate its handling without damage and to protect it against contamination. Buyers of salt for ice control on streets have no particular requirements as to chemical purity whereas a chemical company producing metallic sodium by the electrolysis process can entertain no impurity tolerance. The users of “C” grade rock salt permit a reasonably wide flexibility as to screen size whereas the producers of self-rising flour must have salt of a screen size very similar to the flour to avoid a fatal separation of product ingredients. Such a user must have a fine screen grade that is protected from contamination and caking by packaging. It is practically impossible to contain physically the fine grades of salt long enough to move them from plant to customer unless they are packaged. Where solubility is important to the user such as in the making of butter, only certain grades of flake salt are satisfactory. Where the characteristic of evenness of distribution is of paramount importance to a user such as a cheesemaker, only a grade of flake salt is acceptable. Packaging of these grades is essential to preserve the desired physical characteristics. The producer of animal feeds requires salt with some moisture content for reasons of admixture with other feed materials, whereas pigment manufacturers require salt that is bone dry. Packaging is necessary to protect against the moist salt caking and the dry salt attracting moisture.
23. At all times plaintiff produced and sold in bulk form as much salt as it was able to sell in that form. At no time *660 has any producer of dry salt ever operated at full 24 hours a day plant capacity. The demand for bulk salt is highly seasonal because of the quantities used in ice control. Package material adds nothing to the inherent quality of the salt product; it preserves for and communicates to the customer the desired qualities achieved at plaintiff’s plant and is discarded when the salt is used. Many customers who might be able to accept salt in bulk form insofar as quality characteristics are concerned insist on packaged salt because they lack facilities for storage or handling of salt in bulk form. In those producing areas where the plaintiff lacked certain types and grades of production and therefore purchased such types and grades from other producers, it purchased bulk and packaged salt for resale in the same proportions and for the same reasons of customer demand as though it had produced those types and grades itself. Of the five screen grades of granulated salt, only two are able to be sold in bulk. Of the eight screen size grades of flake salt, only one is able to be sold in bulk. Of the ten screen size grades of rock salt, two are unable to be sold in bulk.
24. There is a minimum of care used in loading salt in bulk. Salt shipped in bulk goes into cars, barges, ships and trucks by means of gravity through loading spouts or by the use of slingers, which are merely mechanical devices for throwing the salt into the transportation units, and those cars, barges, ships and trucks vary in their condition at the time of loading from fairly clean to very dirty. Some of the bulk moves in box cars, some in covered gondola cars and some in covered barges or ships, but the rest moves in open units as to which there is either no protection while in transit, or, at the most, a tarpaulin. At the other end of the line, if the customer takes a salt shipment in bulk form, he must have the mechanical equipment required to unload bulk and must be equally prepared to provide either a warehouse area or an open storage area for the reception of the salt.
25. One grade of granulated salt and two grades of rock salt were physically compressed by plaintiff through mechanical devices into 50-pound blocks, small bricks and spools, small egg-shaped pellets and small tablets. No flake salt was used for compressed items. The demand for blocks, *661 bricks and spools arose because the farmers and ranchers wanted a salt product which could be used in open fields without dissolving as rapidly as large chunks of rock salt and which was smooth so as to avoid the injuries to mouths and tongues of livestock that had resulted from the rough, jagged edges of the rock salt. Pellets were designed to meet the requirements of the growing water softener industry for salt to be used in resin type softeners. Tablets are the result of the recommendations of the medical profession and the demands of the canning industry. In specifying salt to prevent heat exhaustion in humans, doctors recommended tablets to insure proper dosage and to retard and control the dissolution rate in order to prevent nausea. With the advent of high-speed can lines, the canning industry demanded salt in tablet form which provided accurate salt measurement for each can and permitted the injection of salt at high speeds. Competing producers make the same compressed items.
26. The cost to plaintiff of package material with respect to salt sold to markets where packaging was required by law and with respect to salt sold to other markets was as follows:

27. The cost to plaintiff of filling and packing salt sold to markets where packaging was required by law and with respect to salt sold to other markets was as follows:

*662 28.The cost to plaintiff of tlie compression of salt into blocks, bricks, spools, pellets and tablets was as follows:

Compression Year costs

1954_$617,536
1953_ 663, 000
1952_ 616,240
1951_ 494, 600
29.In 1954, plaintiff had a total of approximately 30,000 customers who purchased plaintiff’s salt products in bulk and package form as indicated:

Of plaintiff’s bulk sales of all types of salt in 1954 to its 1,500 bulk salt customers, approximately 59 percent was made to 21 customers as follows:

Of the 21 customers for bulk salt, one used it for water softening and the other 20 used it either for hide curing or chemical operations. The only remaining principal use for bulk salt is in ice control for streets and highways.
30.The gross income ratios of plaintiff’s sales of bulk and package salt were as follows:

*663 In determining its gross income from its property on its income tax returns for each of the years 1951,1952,1953 and 1954, plaintiff deducted the amount of all (a) returns, (b) allowances, (c) freight, (d) warehouse charges, and (e) receipts from the sale of salt purchased from other salt producers, from its gross income from the sale of salt produced at its indicated plants, exclusive of Saltair, Utah. While there was generally no variation in the published f.o.b. plant list prices on the same type and grade of salt among plaintiff’s plants or among the plants of other multiple plant producers, local price competition from time to time would reduce the net revenue return of a particular plant. Again, a local competitive situation requiring plaintiff to meet a price by means of a discount from the list price would affect only the portion of a plant’s sales of a particular type and grade to customers located within a given geographical area. Plaintiff’s f.o.b. plant list prices varied as between granulated salt, flake salt and rock salt at any given time because the costs to produce the three types of salt differ. Various factors, such as a barge company which moved salt back up the Mississippi River as a backhaul for grain shipments and itinerant truckers who avoided the regular rate structure, caused plaintiff to receive lower net revenues at particular plants in order to meet the competition of artificially low transportation costs.
,31. (a) The total tonnage ratios of plaintiff’s sales of bulk and package salt were as follows:

(b) The quantity of sales of salt in bulk differs in the varying areas of the United States, with salt in bulk form for ice control being sold principally in the Northern States and with sales in bulk form to the chemical industry varying between the areas where the chemical plants are located. *664 The ratio of sales in bulk to sales in package form varies between the various plants of the plaintiff, with the variation depending upon whether or not a particular plant is in the area where the sales are made for ice control or for chemical use. For example, the ratio of sales in bulk is high at plaintiff’s rock salt mine at Fairport, Ohio, whereas the package ratio is high at plaintiff’s plant at Port Huron, Michigan.
32. (a) The tonnage ratios by types of salt of plaintiff’s sales of bulk and package salt were as follows:

A higher ratio of rock salt is sold in bulk than is evaporated salt because many uses for rock salt are such that contamination and handling are not problems.
(b) The tonnage ratios by types of evaporated salt of plaintiff’s sales of bulk and package salt were as follows for the years 1953 and 1954, no breakdown being available for the years 1951 and 1952:

33. Plaintiff’s salt, with only the exceptions hereinafter noted, had to reach the eighth basic stage of extraction and processing for evaporated granulated salt and evaporated flake or grainer salt (stage 8) and the tenth stage for rock *665 salt (stage 10) before a portion of it was sold. The exceptions were as follows:
(a) With respect to evaporated granulated and evaporated flake or grainer salt, the indicated tonnages were sold between stages 4 and 5, after the salt underground had been brined, pumped, purified and evaporated, and said tonnages compared with the total tonnages of evaporated salt sold as follows:

(b) With respect to rock salt, the indicated tonnages were sold at a point earlier than stage 10, after the rock salt from the muck pile had passed through the grizzly and primary crusher and the above ground surge bin, and said tonnages compared with the total tonnages of rock salt sold as follows:
Year Total tonnage of rock salt Tonnage sold before stage 10 Percent of total 1954. 1953-1952., 1951. 499,691 490,430 467,426 427,690 1,986 6,803 7,722 6,731 1.38 1.65 1.57
34. Several other companies produce and sell finished salt products in the same form as the plaintiff. For the years involved, four of these companies (International Salt Company, Diamond Crystal Salt Company, Carey Salt Company and Watkins Salt Company) sold large quantities of bulk salt in the various described types and amounts set forth in the following chart. In each case, the stage in which the amounts of salt were sold corresponds to the described stages contained in finding 11 above. The chart also sets forth the types and the amounts sold by these companies in such years in packaged form.

*666

*667

*668

*669 35. Except for one small producer who sold brine within a limited plant radius and some rare inconsequential instances historically on the part of a very few other producers, no dry salt producer marketed salt immediately after the extraction stage during the years herein involved. Brine is at least 77 percent water and is transported only very short distances. Brine is produced principally by chemical companies for their own uses. Normally these chemical companies do not sell sodium chloride to others.
36. The producer referred to in finding 35 was the Texas Brine Company of Houston, Texas. For the years involved this company sold the following tonnages of salt, on a dry salt basis, and received the following amounts of gross income:

The company transports the brine by pipeline approximately 20 to 24 miles. The brine sold contained approximately 2.6 pounds of dry salt a gallon. Each gallon of brine weighs approximately 10 pounds at 60 degrees. The price per ton shown in the above chart was determined by dividing the gross income by total tons the company are as follows: each year. The customers of

Major accounts

Goodyear Tire & Rubber Go.
Champion Paper Go.
Ethyl Corporation

Other accounts

General Tire & Rubber Co.
Carbide & Carbon Oo.
Humble Oil & Refining Co.
Monsanto Chemical Co.
American Oil Co.
Shell Chemical Co.
Houston Light & Power Co.
Sinclair Refining Co.
Phillips Chemical Co.
Distillate Products Co.
*670 37. Sparta Oil Company, Houston, Texas, produces brine in connection with its oil operations and sells its entire brine output to Brine Service Company, f.o.b. Pierce Junction, Houston, Texas. The brine sold by Sparta Oil Company contained approximately 3.01 pounds of dry salt and 7.19 pounds of water, a total of 10.2 pounds. Each barrel of brine contained approximately 301.98 pounds of water and 126.42 pounds of dry salt, a total of approximately 428.40 pounds of brine. Each ton of brine contained approximately 15.82 barrels of brine. Information is not available for the years 1951 and 1952, but in 1953 and 1954 Sparta Oil Company produced and sold to Brine Service Company brine containing the tonnage of dry salt and for which it received gross income as follows:

The price per ton shown above was determined by dividing the gross income by total tons for each year. Brine Service Company transported the brine by trucks from Pierce Junction, Houston, Texas, approximately 12 miles to its major customer, Goodyear Tire & Bubber Company, which purchased it at a delivered price amounting to an average of $3 a ton. Each tank truck of Brine Service Company carries approximately 100 barrels of brine.
38. The United States Department of the Interior, Bureau of Mines, publishes annually a Minerals Yearbook. A chapter from volume 1 of the 1954 yearbook, entitled “Salt,” discusses salt production in the United States, its consumption and uses, salt prices during the year, imports and exports, advances in technology, and reviews salt production throughout the world. Included therein (p. 1) is a chart setting forth certain data concerning domestic production of salt. Pertinent portions of this chart, together with the introductory comments concerning the chart, are as follows:
the TONNAGE of salt produced in the United States in 1954 was second only to the record reached in 1953.
*671 A decline in production of salt in brine more than offset slight gains in evaporated and rock salt during the year, so the total salt output in 1954 was less than 1 percent lower than in 1953:
Table 1. — Salient statistics of the salt industry in the United States, * * * [19S1]-19S4

It is also stated therein:
CONSUMPTION AND USES
Salt is an essential article of diet, but only a small percentage of the total salt consumed was used in this way. By far the greatest use of salt was in the production of soda ash (sodium carbonate), which in turn had a multitude of uses. Large quantities of salt also were utilized in manufacturing chlorine, bleaches, and other chemicals, as well as in water treatment, meat packing, feed mixing, and the many other categories listed in table 7 [omitted]. (pp. 2-3)
$ ‡ 9{: ^ $
PRICES
According to Oil, Paint and Drug [Reporter prices of rock salt and table salt were steady throughout the year. Bock salt in bags, carlots, works, was quoted at $0.98 per hundred pounds and table salt (vacuum common), same basis, was quoted at $1.12 per hundred pounds. The average value of dry salt reported by producers to the Bureau of Mines increased from $7.99 in 1953 to $8.58 in 1954. The average value reported for salt in brine rose sharply from just under $1 per ton in the *672 preceding 5-year period to $2.66 per ton in 1954. This did not indicate a major increase in brine-salt prices but reflected primarily a change in reporting practice. Because much of the salt produced as brine was consumed by the producing companies, relatively few sales transactions occurred. Heretofore, values assigned by many producers have been far below market value. In the 1954 canvass a general effort was made to obtain reasonable local market valuations for salt in brine. Consequently, the average value for 1954 was much higher than for the previous year. (pp. 5-6)
39. The processes following the extraction of brine to reach evaporated granulated or flake salt by the hydraulic mining method are referred to in the salt industry as refining processes. As shown by the data compiled by the Bureau of Mines, set forth in finding 38, the term “manufactured” is also sometimes used to describe such processes in the production of evaporated dry salt. As hereinabove shown, there is no change in the chemical composition of salt effected as a result of such refining processes.
40. The processes employed by plaintiff in its various facilities with respect to the production of rock salt, evaporated granulated salt and evaporated flake or grainer salt were, with only minor and inconsequential deviations, identical with those employed by all other members of the salt industry. There have been few, if any, patents or secret methods extant in the salt industry with respect to the processes for producing commercially marketable salt. Hence, as a matter of history in the industry, all processes have been available to and known by all members of the industry, with the result that processes in the salt industry have been as nearly standardized as those in any industry in the country. However, throughout the industry there are some differentials in the NaCl purity percentages between rock and evaporated salt, and there are some purity differentials within the separate rock and evaporated salt categories themselves which accordingly necessitated slightly different treatments for the elimination of “impurities.” There has been no basic change in the production processes of dry salt for over 50 years. Plaintiff employs the same processes at all plants for the same types of salt. No producer of dry salt employs any proc *673 ess not employed by the plaintiff and plaintiff employs no processes not employed by other producers of dry salt. With only inconsequential exceptions relating to packaging and labeling, no one other than a dry salt producer has ever performed any of the individual processes involved in the various stages of producing dry salt described in finding 11.
41.The principal producers of dry salt produced and sold the types of salt as indicated by an “X” as follows:

On a tonnage basis, the smaller producers sold a higher percentage of their total production of salt in packaged form than did the producers of larger tonnages of salt. No producer has ever operated a plant for the production of salt to be sold only in bulk. The types of packs and package material used in packaging dry salt are standard in the industry.
42. The requirements of salt purchasers, except only for some variations between trade areas in the country, were and are highly standardized so that all members of the salt industry were and are confronted with similar markets. However, among salt purchasers there was and is a wide variation in quality requirements. Salt has a very large number of uses ranging over a wide variety of products and services with thousands of direct and indirect applications.
43. During the years herein involved, plaintiff sold salt in all the then 48 states. As salt is a heavy, cheap commodity, the cost to transport it is relatively high as compared to the f.o.b. plant price of the salt. In certain *674 instances, the cost of transportation has been the substantial part of the total invoice price. The distance that salt can be economically transported is directly related to the cost of transportation. As a result, local markets exist for the sale of salt, which markets are centered around the producing areas of New York, Ohio, Michigan, Kansas, Louisiana, and Texas. Kail transportation being the predominant type of transportation of salt, rail rates basically determine the cost of transportation used by the dry salt industry. Salt receives a commodity rate which is a percentage of the class rate. The percentage of the class rate for shipment in package form is 22% percent and for shipments in bulk form it is 17% percent, but the minimum loading requirement for shipments in bulk form is 40 tons per car, whereas for shipments in package form the minimum is 22% tons per car. The reason for the differential is that salt shipments in packages would be damaged under excessive loading conditions. The fact that the salt is packaged, contains additives, or is compressed, does not affect its commodity designation as salt. Other producers of dry salt have plants in only certain of the producing areas and participate only in the respective markets.
44. In order to obtain maximum sales of the dry salt products that are produced by the salt producers, each must be able to furnish a full line of such products to customers to permit making up units of distribution such as carloads, barge loads and truck loads. Each producer either produces a full line or purchases from another producer the products that it does not produce. For example, because plaintiff did not have an available rock salt supply to meet the demands of its customers east of Ohio and in the eastern seaboard states, it opened a mine at Fairport, Ohio, in 1958.
45. In the sense that those members of the salt industry, such as plaintiff, who sell all or substantially all of their entire production as dry salt and do not themselves use salt in any form in connection with the production of other products, such as canned goods, paint pigments, butter, or animal feed, they are nonintegrated companies. Similarly, in the sense that certain companies, such as chemical companies producing chlorine or soda ash, operate their own salt mines *675 and extract salt therefrom in brine form, using the entire production thereof for their own purposes (referred to as a “captive” operation), they are to such degree integrated companies. The terms “integrated” and “nonintegrated” are frequently so used in a technical sense in the accounting profession as well as in the professional business analysis or management consultant field.
46. (a) An accepted sense in which the term “constructive income” is technically employed by the accounting profession is to describe a situation in which the right to income has been earned and is, though the receipt thereof is deferred, legally entitled to be converted on some future date into liquid funds. In that accounting sense as applied to plaintiff’s operation, plaintiff, in its closed circuit hydraulic gravity mining operation for the production of dry granulated or grainer salt, did not, during the years herein involved, have constructive income at the point at which the brine was produced at the wellhead. As shown, the points at which plaintiff’s sales occurred in the tax years herein involved were beyond such wellhead stage of production and at levels at which the product had reached the dry granulated or grainer stages.
The term is not used for external financial reporting or internal accounting purposes by nonintegrated companies as defined above. It is, however, occasionally used for purposes of internal controls by integrated companies as herein defined.
(b) Similarly, in the case of a nonintegrated company such as is described in (a) above, an accepted sense in which the term “market value” is technically employed by the accounting profession would be the amount resulting from gross income from sales of the dry salt in its various end forms, less returns, allowances, and transportation, which the accountant would refer to as the amount resulting from “net sales,” and which amount, depending upon a variety of factors, may or may not result in a “profit” to the individual producer. In plaintiff’s case, this would be the sales prices of plaintiff’s various dry salt products on board transportation units f.o.b. its plants. It is at such point that plaintiff’s sales, whether in bulk or packaged (or boxed or *676 bagged) form, give rise to “accounts receivable” in said technical accounting sense. Consequently, in connection with plaintiff’s operations, it was not considered from a technical accounting standpoint as having any constructive income prior to the point at which its products were sold and accounts receivable established therefor on its books.
(c) The term “value in place” in the case of minerals is, in the accounting profession, a term used to evaluate the minerals wherever they happen to be located in the form in which they are found. From the accounting standpoint, such value in place is normally determined on the basis of projecting the future “market value” as hereinabove defined and then discounting such value to the present date.
47. In the course of auditing plaintiff’s income tax and excess profits tax returns for the years 1951, 1952 and 1953 and plaintiff’s income tax return for 1954, the Internal Revenue agents recommended the disallowance of a portion of the depletion claimed by plaintiff for each of said years and deficiencies were determined and assessed against the plaintiff by the defendant as follows:

48. On July 29, 1955, plaintiff paid to the defendant the sum of $3,789,537.58, of which the sum of $3,759,367.60 represented the amount of the deficiencies assessed as aforesaid for the years 1951, 1952 and 1953, together with interest, computed as follows:

*677 49. On August 28, 1957, plaintiff paid to defendant the sum of $1,366,143.18 of which the sum of $1,363,949.04 represented the amount of the deficiency assessed as aforesaid for the year 1954, together with an additional uncontested deficiency assessment in the sum of $60,118.82, plus interest and less credit for overassessments, computed as follows:

50. The overassessments in the total amount of $141,398.46, referred to in finding 49, were credited by defendant as of March 8, 1956, against the said deficiency assessed against plaintiff as described above. Interest for the period from March 15, 1955, the due date for the payment of plaintiff’s 1954 income tax, to March 8, 1956, on said uncontested deficiency assessed in the amount of $60,118.82 equals $3,523.94, so that the uncontested deficiency and interest thereon total $63,642.76. The sum of $141,398.46 less said amount of $63,642.76 equals $77,755.70.
,51. The disallowance by the Internal Revenue agents of a portion of the depletion deduction claimed by plaintiff for the years in question and the subsequent deficiency computations, all as described above, were based upon a depletion base determined, according to the examining Internal Revenue agents, as follows:
(a) Direct cost centers are segregated to allowable and unallowable processes at producing plants. Allowable includes the cost of production from the well or mine through drying and screening. Unallowable includes all operations beyond the dried, screened stage.
(b) Indirect costs are spread to each activity on the percentage of direct cost, and then, at each plant eligible for depletion, the amount is allocated between allowable and unallowable processing.
(c) Inasmuch as there are salt tonnages sold by each plant in bulk, these sales were segregated. Included here as bulk “sales” are tonnages which were shipped from plant to warehouse, or plant to plant, and largely *678 packaged at the latter points. These are recorded on company books as “transfers” and sales (bulk or packaged) are credited back to the shipping plant. Herein, these intercompany transfers are considered sales of bulk at the same value indicated by customer sales. It should be noted that in 1952 and Í953, records of these bulk sales and transfers were kept on the basis of sales or transfer value exclusive of freight. However, these amounts included freight. Therefore, the value/ton indicated in 1952 was used in 1951. No discrepancy is indicated owing to the fact that the OPS prices established in 1950 existed until 1953. The cost of production on salt sold or transferred in bulk is established by multiplying tonnage (air dried or kiln dried grainer or vacuum pan) times applicable cost/ton. To this was added bulk loading cost. (In 1953 the latter cost was identified; in 1951 and 1952, it has been built up on the 1953 cost/ton.)
(d) After segregation of income and costs applicable to bulk salt sales and transfers, all other, i.e._ processed, salt is considered for depletion by segregation of cost between allowable processing and manufacturing. The allowable processing cost of salt sold other than plain bulk is the total allowable direct cost less than [sic] applicable to bulk sales. All other direct plant costs are considered to be manufacturing (or unallowable). As previously stated, each of these two categories of cost on processed salt takes its aliquot portion of indirect expense. The total cost (direct and indirect) to the bulk stage then receives its proportion of the income from processed salt as depletable gross income.
52. On March 30,1956, plaintiff duly filed separate claims for refund of Federal income and excess profits taxes paid by plaintiff for each of the years 1951, 1952 and 1953 as the result of the deficiencies assessed with respect to percentage depletion deductions claimed by plaintiff. On March 20, 1958, plaintiff duly filed a claim for refund of Federal income taxes paid by plaintiff for the year 1954 as the result of the deficiency assessed with respect to the percentage depletion deduction claimed by plaintiff. These claims asserted that plaintiff had applied the depletion percentage for sodium chloride to its net sales of all its salt products to determine its depletion allowance and that the auditing agent of *679 the Internal Revenue Service applied a different formula, thereby erroneously reducing plaintiff’s percentage depletion allowance. No final action on these claims for refund has been taken.
.53. On December 16, 1955, plaintiff duly filed separate claims for refund of Federal income and excess profits taxes paid by plaintiff for each of the years 1951,1952 and 1953 as the result of deficiencies assessed with respect to amounts received by plaintiff in excess of cost upon the sales of shares of its treasury stock to its employees. Plaintiff duly filed a claim for refund of Federal income taxes paid by plaintiff for the year 1954 as the result of the erroneous failure to reduce long-term capital gain by the amount of capital loss carryover from the years 1952 and 1953. No final action on these claims for refund has been taken.
54. On March 20, 1958, plaintiff duly filed a claim for refund of Federal income taxes paid by plaintiff for the year 1954 as a result of erroneous additional interest assessed on the deficiency assessed with respect to the percentage depletion deduction claimed by plaintiff. No final action on this claim for refund has been taken.
55. The matters referred to in finding 53 are the subject of Count II of the petition herein, as supplemented by the “first supplement” thereto. The matters referred to in finding 54 are the subject of Count IY of said first supplement. By a stipulation filed June 13, 1960, the parties agreed that (1) with respect to the allegations contained in said Count II, plaintiff is entitled to recover the amount of the deficiencies paid, together with interest thereon as provided by law, and (2) with respect to the allegations contained in said Count IV, plaintiff is entitled to recover an amount equal to 67% percent of the amount of the deficiency paid as set forth in Count IY, together with interest thereon as provided by law.
As a result of this stipulation, there remains for decision by the court only the issue concerning the correct basis upon which to compute plaintiff’s allowance for percentage depletion, which issue is the subject of Counts I and III of said petition as supplemented by said first supplement.
*680 56. The parties have, by stipulation filed herein on May 20, 1960, agreed that the remaining basic issue involved in this case for disposition by the court is the proper determination of plaintiff’s basis for percentage depletion under sections 23 (m) and 114(b) (4) of the Internal Eevenue Code of 1939, as amended, with respect to the years 1951, 1952 and 1953 and under section 613 of the Internal Eevenue Code of 1954, as amended, with respect to the year 1954. As to this issue, the parties have, pursuant to Eule 38(c), further stipulated, with the approval of the commissioner, that the trial would be limited to the issues of law and fact relating to the right of plaintiff to recover, reserving the determination of the amount of recovery, if any, for further proceedings.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on Counts II and IY of the petition, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Eule 38(c) of the Eules of this court.
Plaintiff is not entitled to recover with respect to Counts I and III, and that portion of its petition is dismissed.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on August 16,1963, that judgment for plaintiff be entered for $97,609.27, together with interest as provided by law on the following amounts from the following dates to date of payment:
from 1955
4,927.32 from July 29,1955
6,211.67 from July 29,1955
480.89 from December 14,1954
3,986.74 from June 15,1955
63,452.58 from December 3,1957

 Section 23(m) provides as follows:
“(m) Depletion.
“In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. » * 26 U.S.C. §23(m) (1952).

 “§ 114. Basis for depreciation and depletion—
* * * * *
“(b) Basis for depletion—
v # * * *
“(4i) Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits.
“(A) In general.
“The allowance for depletion under section 23 (m) in the case of the following mines and other natural deposits shall be—
“(i) in the ease of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum,
» * * * »
*642 of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property.. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph.
“(B) Definition of gross income from property.
“As used in this paragraph the term ‘gross income from the property’ means the gross income from mining. The term ‘mining’ as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, * *
26 U.S.C. § 114 (1952). For the definition of “ordinary treatment processes,” see note 10, infra.

 For the depletion provisions of the Internal Revenue Code of 1954, see 26 U.S.C. § 613 (1958).

 Plaintiff’s petition sounds in four counts. Count I sets out plaintiff’s claim for refund of taxes based upon its depletion allowance computations for 1951, 1952, and 1953. Count III sets forth a similar claim for 1954. Counts II and IV relate to deficiencies assessed against taxpayer with respect to amounts received in excess of cost upon the sale of shares of treasury- stock to its employees. As indicated in finding 55 of the trial commissioner’s report, counts II and IV have been stipulated and are not in issue before the court.

 For the tax regulations relating to the 1939 Code provisions, see Treasury Regulation 118, section 39.23(m)-1(e). In respect to the Internal Revenue Code of 1954, see § 1.6.3-3, Proposed Treasury Decision, published 11-3-56.

 As the trial commissioner reported in finding 51, this position is tile one adopted by the Commissioner of Internal Revenue in passing upon plaintiff’s claim.

 The initial depletion allowance program was established by the Income Tax Act of 1918, 38 Stat. 167.

 Revenue Act of 1918, 40 Stat. 1067.

 Revenue Act of 1926, 44 Stat. 16. Section 204(c) (2) of that Act provided : “In the case of oil and gas wells the allowance for depletion shall he 27% per centum of the gross income from the property during the taxable year.”

 “The term ‘ordinary treatment processes’, as used herein, shall include the following:
* * * * *
“(iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product— sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product — crushing, grinding, and beneficiation by concentration, * * * cyanidation, leaching, crystallization, precipitation * * 26 U.S.C. § 114(B) (1952).

 Cannelton Sewer Pipe Co. United States, 268 F. 2d 334 (7th Cir. 1959).

 This principle was reaffirmed in Riddell v. Monolith Portland Cement Co., 371 U.S. 537 (1963). Reversed and remanded on the strength of Cannelton. In the lower courts, see, e.g., Riddell v. Victorville Lime Rock Co., 292 F. 2d 427 (9th Cir. 1961); Commissioner v. Halquist, 291 F. 2d 49 (7th Cir.), cert. denied, 368 U.S. 930 (1961) ; Standard Realization Co. v. United States, 289 F. 2d 247 (7th Cir. 1961) ; U.S. Pumice Supply Co. v. Commissioner, 36 T.C. 1160 (Sept. 29, 1961) ; Vulcan Materials Co. v. Sauber, 7 AFTR 2d 1130 (1961) ; Fannin Investment Co. v. United States, 197 F. Supp. 693 (N.D. Ga. 1961).

 Bureau of Mines Minerals Yearbook, 1954, Vol. 1.

 International Salt Co., Diamond Crystal Salt Co., Carey Salt Co., and Watkins Salt Co. We accept these as representative, since they appear in the record by stipulation of the parties.

 See the Court’s summation in note 10, United States v. Cannelton Sewer Pipe Co., 364 U.S. at 89. The series of cases commencing with United States v. Cherokee Brick & Tile Co., 218 F. 2d 424 (5th Cir. 1955) and culminating with United States v. Merry Bros. Brick & Tile Co., 242 F. 2d 708 (5th Cir. 1957) were decided on the basis of concessions made by the Government. In Cherokee, for example, counsel for the Government admitted the crucial fact that only negligible quantities of raw clay were sold before being converted to brick. In Commissioner v. Iowa Limestone Co., 269 F. 2d 398 (8th Cir. 1959), and like cases, the decision turned on the “profitability” test rejected in Oannelton.

 See, e.g., the cases cited in n. 12, supra. In the Halquist case, plaintiff claimed that veneer stone was its marketable product but the court held that “in the light of Oannelton,” processing rough uncut blocks of stone Into veneer blocks could not be considered “mining.” The court said that, lacking local information as to the marketability of rough stone, it must make recourse to the industry in general. In Standard Realization, where over 60 percent of plaintiff’s product was shipped in the form of bulk silica sand without grinding or bagging, the court excluded these latter processes from the computation. The remainder of the cited cases follow in suit.